# Illinois Official Reports

## Supreme Court

*People v. Sebby*, 2017 IL 119445

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MONTANA SEBBY, Appellant. |
| Docket No. | 119445 |
| Filed | June 2, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of La Salle County, the Hon. Cynthia Raccuglia, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Peter A. Carusona, Deputy Defender, and Editha Rosario-Moore, Assistant Appellate Defender, of Ottawa, for appellant.<br><br>Lisa Madigan, Attorney General, of Springfield (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and John R. Schleppenbach, Assistant Attorneys General, of Chicago, of counsel), for the People. |

Justices                   JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Thomas, Kilbride, and Garman concurred in the judgment and opinion.

Chief Justice Karmeier dissented, with opinion.

Justice Burke dissented, with opinion, joined by Justice Freeman.

**OPINION**

¶ 1      Defendant, Montana Sebby, was convicted by a jury of resisting a peace officer, a Class 4 felony (720 ILCS 5/31-1(a-7) (West 2010)), and sentenced by the trial court to two years' imprisonment. On appeal, the defendant argued that the trial court committed error in admonishing prospective jurors pursuant to Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) and that, despite his failure to object to that error, he was entitled to a new trial because the evidence was closely balanced. A majority of the appellate court disagreed with the defendant and affirmed his conviction and sentence. 2015 IL App (3d) 130214.

¶ 2      For the reasons that follow, we reverse and remand for further proceedings.

¶ 3                            BACKGROUND

¶ 4      In 2011, Bonnie and Howard Sebby lived on a farm in rural La Salle County near Utica. The Sebbys had four children: the defendant; his older brother, Oakland Sebby; and his younger twin sisters, Casey and Elizabeth Sebby. Casey and Elizabeth died in a car accident on September 23, 2011, and on October 18 the trial court entered an order granting temporary physical custody of Casey's daughter, L.S., to her biological father. The order directed law enforcement officials to assist the father in obtaining L.S. from "whoever had physical custody of the child."

¶ 5      The La Salle County sheriff's office believed that L.S. was staying with the Sebbys, and they visited the farm with the custody order three times. The first time was October 21. The second time was October 26 at 5:30 p.m., when Investigator Jason Martin attempted unsuccessfully to serve the order on Bonnie. Around 12 hours later, on October 27, three uniformed deputies—Joshua McGrath, Jason Mohr, and Jarred Arthur—arrived at the farm around 6 a.m. The defendant, who did not live with his parents but had spent the night at their house, came to the door and spoke with the deputies. What happened next is in dispute. What is not in dispute is that the defendant ended the encounter in custody, charged with resisting a peace officer.

¶ 6      The case proceeded to a jury trial. The La Salle County circuit court[1] admonished the jury pool as to the so-called *Zehr* principles (see *People v. Zehr*, 103 Ill. 2d 472 (1984)), enumerated in Rule 431(b):

"The most important law on a criminal case is the defendant[,] who you will meet in a moment[,] is presumed innocent. The presumption of innocence exists throughout the trial. The defendant doesn't have to prove anything. The defendant doesn't have to

---

[1]The judge who presided over the defendant's trial was not the judge who signed the custody order.

testify. The defendant doesn't have to present evidence, and the defendant, if he does not, and you cannot and you must not hold that against him or assume anything by that. The State is obligated by law to prove the defendant guilty beyond a reasonable doubt."

¶ 7   The trial court questioned potential jurors in panels of six. During the questioning of the first panel, the court talked to a potential juror about the *Zehr* principles:

"Q. First of all, you need to understand the presumption of innocence.

A. Understood.

Q. But what if the defendant denies that but you have to understand that may be a story told, and it may be you having to decide whether it's a story told and credibility. I can't say that may not be the story. I may have to say that's what somebody says, but the defendant by the way who's presumed innocent doesn't have to testify, and if he doesn't, you must not hold that against him. Would that affect your decision?

A. Not if there's no evidence pointing to that fact.

Q. Okay. Good. That's what I'm looking for. That was a very good answer because that was the answer in this case. Now, going back to all six of you, the defendant is presumed innocent, and that presumption of innocence exists throughout the trial. The defendant does not have to prove anything. He doesn't have to testify. He doesn't have to present evidence, and if he does not, then you must not hold it against him. It's the State's burden to prove the defendant guilty beyond a reasonable doubt, and I need to go through each of you with that."

¶ 8   The trial court then individually asked the remaining members of the panel whether any of them "[h]ad any problems" with those principles, while interweaving questions about whether there was anything that would prevent them from being fair and impartial in evaluating the evidence. The trial court specifically repeated its question with respect to the presumption of innocence to two potential jurors because they indicated that they might be biased. Using similar phrasing, the trial court spoke to each panel of prospective jurors about the *Zehr* principles. The trial court again asked the individual jurors of each panel whether they "[h]ad any problems" with or "believe[d] in" those principles, as well as whether anything would prevent them from being fair and impartial.

¶ 9   Following opening statements, the State called its first witness, Deputy McGrath. McGrath testified that on October 27, 2011, he went with Deputies Mohr and Arthur to serve the court order at the Sebby residence. After he knocked on the door for several minutes, a woman answered the door. McGrath asked the woman if she lived there, and she said no. He then asked to speak to someone who did live there, and the woman said that "nobody else was home." McGrath explained that "it was imperative that we made [*sic*] contact with a resident of the house and the child and that to prevent anybody from getting in any further trouble or any trouble whatsoever it would be best to cooperate and explain to us how we can make contact with the home owner or resident of the house."

¶ 10   According to McGrath, the defendant then came to the door. Mohr handed a copy of the court order to the defendant, and the deputies again explained why the police were at the house. McGrath testified that the defendant was "basically uncooperative and upset that we were there." When the deputies asked where the child was, the defendant told them that she was "on vacation with Bonnie and he didn't know where or how to get a hold of them." The

- 3 -

conversation between McGrath and the defendant occurred just outside the house. The defendant became

> "more and more agitated about what was going on. He handed the court order back to Deputy Mohr saying this is not a search warrant which we never said it was and then he reached over and poked me in the shoulder as he was yelling for us to get out of the—poked me in the shoulder area as he was yelling for us to leave his property."

¶ 11    McGrath advised the defendant that he was under arrest for battery of a peace officer. McGrath reached for the defendant's wrist, but the defendant "pulled away and resisted arrest at that time." McGrath and Mohr then "attempted to gain control of [the defendant] as he was basically thrashing his body about trying to get away and resist arrest." The deputies then assisted the defendant to the gravel driveway in an effort to gain control over him. They repeatedly told him to stop resisting and to put his hands behind his back because he was under arrest. Eventually, the deputies handcuffed the defendant and placed him in the backseat of Mohr's squad car. At that point, McGrath noticed that Mohr "had some scratch marks on his hands, on both hands and wrist area of his right hand," as well as some scratches on the back of his left hand. McGrath testified that the scratches were "not bad" but were "definitely open scrapes and cuts."

¶ 12    At that point, Oakland Sebby came to the door of the house. McGrath explained why the police were there and asked if they could enter the house to "check" for the girl. Oakland refused. The deputies then took the defendant to the La Salle County jail, where he was given *Miranda* warnings. McGrath asked the defendant "why he poked me the way he did[,] he stated that he was just getting ready to tell us we could go in and check the house for [L.S.] and then when I explained to him [']you were just seconds before yelling at us to leave your property when you reached over and poked me,['] he did not want to talk any further."

¶ 13    On cross-examination, McGrath did not recall whether he stuck his foot in the door when the woman answered his knocking, but he admitted that the deputies did not have permission to enter the house. McGrath testified that after he was told by the woman and the defendant that the girl was not there, he remained at the house "[b]ecause I had reason to believe they were not telling the truth." McGrath elaborated:

> "[W]hen I answered [*sic*] the door the first time somebody comes to the door and turns off the light and doesn't open the door. I knock on the door again and a female answers and says she's the only one there. Nobody else is there and then all of a sudden [the defendant] shows up at the door a few moments later and then a few moments after that Oakland shows up at the door so obviously I had been lied to already during that time."

¶ 14    McGrath stated that the woman did not lie about the fact that Bonnie Sebby was not at the house: "I was not lied to, but I was not allowed in the house either." McGrath reiterated that the deputies remained at the house, even after being told to leave by the defendant, because they believed that the woman had lied to them and they "had a responsibility to make every attempt to get that court order served."

¶ 15    McGrath denied that the defendant merely brushed him: "He poked me as he was yelling profanities at us to get off of his property." McGrath explained that "[d]ue to [the defendant's] resistance we attempted to gain control of him standing up. That wasn't happening. We took him—Deputy Mohr was the one that had more of a hold on him. We then placed him to the ground, assisted him to the ground." When asked whether he could state how Mohr was

- 4 -

injured, McGrath testified, "[The defendant] resisted when I told him he was arrested for poking me in the shoulder so if he would have cuffed up at that point in time, we never would have had to go to the ground in the first place so I believe the responsibility remains with him." McGrath added: "Deputy Mohr was injured while we were trying to gain control of [the defendant] while we were on the ground." McGrath admitted, however, that he did "not know exactly at what point and time" Mohr's injuries occurred. McGrath concluded that the defendant's "moving and rolling around on the ground was to prevent us from taking him into custody."

¶ 16    On redirect examination, McGrath testified that the defendant

> "pulled away from us, when he pulled away from me initially when I told him he was under arrest for poking me in the shoulder, he pulled away and headed towards I guess towards Deputy Mohr, and when we were trying to get him to the ground it was basically him still attempting to get away from us."

McGrath asserted that "the fact of [the defendant's] level of resistance" took the deputies to the ground. The deputies and the defendant "rolled around in different positions for a few moments before we were able to get him to his stomach and try to get his hands behind his back."

¶ 17    Deputy Mohr testified that he rode in a squad car to the house with McGrath. When they arrived to serve the court order, they "attempted to make contact with someone knocking on the door several times" over 5 to 10 minutes. According to Mohr, "[t]here was a light on inside of the house," but "[s]omeone had turned it off while we were standing outside knocking." A woman finally came to the door. When the deputies asked to speak to a home owner, the woman "said there was no one else home but her."

¶ 18    The defendant then came to the door. Mohr and McGrath tried to explain the court order, and Mohr gave a copy of it to the defendant. The defendant gave it back to Mohr. Mohr testified that the defendant was "somewhat hostile" and "a little upset that we were out there in the morning." Mohr added that the defendant told the deputies "[t]o get off the property and that the paper that I gave him wasn't a search warrant." The defendant then poked McGrath "in the left shoulder, chest area." McGrath advised the defendant that he was under arrest and "attempted to gain control of his arm to place them behind his back." The defendant resisted by "pulling away" and "lurching around," so Mohr helped McGrath. Mohr recalled that the defendant was shirtless. They took him to the ground in a "somewhat controlled" fall, which ended with all three men in the gravel driveway. A struggle ensued for 20 seconds, in which the defendant tried to pull his hands under his body. The defendant "had landed like on his chest or his side and was just told to put his hands behind his back. He didn't comply. He just continued to put his hands away from us. Eventually we were able to gain control and get his arms behind him and handcuff him." Mohr's hands were between the defendant and the gravel driveway. Mohr had to "get under there and get a hold of him and pull his hands out from under him and get them back behind his back." Mohr later noticed scrapes on his hands and wrists from the gravel.

¶ 19    On cross-examination, Mohr conceded that he may have been handed a shirt for the defendant after he was in the squad car. Mohr denied that McGrath kicked at the door. He merely "knocked at a reasonable level so it could be heard." He also denied that he was agitated, and he did not recall using profanities or threatening to pull the defendant's mother

- 5 -

from the house by her hair. Mohr could not say "100 percent" that the scrapes came from the gravel but added "that was the only place I was other than standing was in the gravel." He did not believe that McGrath or Arthur could have grabbed his arm and caused the scrapes, but he again could not say "100 percent." Mohr testified that he and McGrath were an arm's length from the defendant when he stepped forward and poked McGrath in the chest. Mohr admitted that the incident report did not state that the defendant stepped forward.

¶ 20    Deputy Arthur testified that he arrived at the house shortly after McGrath and Mohr. Arthur's version of events was succinct: "We attempted to serve the paper. [The defendant] poked Deputy McGrath." According to Arthur, the defendant was "hostile verbally and would not accept the paper." The defendant was wearing shorts, but no shirt. After he poked McGrath, McGrath tried to place him in handcuffs: "[H]e resisted, and he was taken to the ground." Arthur restrained the defendant's feet, while McGrath and Mohr got his arms "out from underneath him." Arthur noticed Mohr had several scratches on his hands.

¶ 21    On cross-examination, Arthur testified that McGrath and Mohr were two feet from the defendant when they spoke to him. Arthur agreed that distance was "[p]retty close quarters" and "crowded" but stated that the defendant stepped toward McGrath, even though that fact did not appear in the incident report. Arthur was "off to the side" and remembered seeing "some sort of contact" between the defendant and McGrath. Arthur added that the deputies were asked to leave the property "[o]nce or twice" but did not do so because they had "a responsibility to attempt to locate that child." He denied that McGrath and Mohr used profanity.

¶ 22    The trial court denied the defendant's motion for a directed verdict, and defense counsel called Angela Dankenbring as a witness. Dankenbring testified that she was a family friend who had previously dated Oakland. Dankenbring went to the house on the night before the incident and encountered Howard but no one else. Dankenbring spent the night there, sleeping on a couch in the living room. At 6 the next morning, she "woke up to very loud pounding on the door." The door was shaking, and she was afraid it would break. She thought Howard was knocking at the door because he had forgotten his keys. When she opened the door, she saw a deputy sheriff.

¶ 23    The deputy asked if Bonnie was at the house. Dankenbring said that she was not but she did not know where she was. Dankenbring also said that she did not know if anyone else was at the house. The deputy asked her for identification and "shoved his foot in the door and wouldn't let me shut the door." According to Dankenbring, the deputy was "very belligerent" and "hostile," "yelling" that he would arrest her for obstructing justice and that she just needed to cooperate. Over the course of 5 to 10 minutes, Dankenbring and the deputy spoke: "We just kept going back and forth because he wanted to search the house, and I said it wasn't my house. I don't feel like I can give you permission to search it. It's not my home, and we just kept doing that." As the deputy became more agitated, the defendant came upstairs.

¶ 24    Dankenbring testified that the defendant stepped outside the house to talk to the deputies. She ran for a sweatshirt and shoes, returned to the door, and stood behind the defendant. The deputy to whom Dankenbring had spoken was a foot away from the defendant, and the other two deputies "kind of kept their distance" several feet away. Dankenbring described their conversation:

"[The defendant] said that his mother wasn't home and then they were asking about [L.S.] He said that she was with [her] grandmother on vacation. He didn't know where they were. They asked him to try to contact his mother. He was like she's not going to answer at [6] o'clock. He'd ask them to please leave because he had already told them she was out of town and she wasn't there, and he asked them repeatedly to please leave."

Dankenbring said that the defendant was "loud" but not "physical or anything." He was "loudly saying [']I'm tired of this. You need to please leave my family alone. It's 6:00 a.m. My daughter's sleeping. Leave.['] " The deputies did not leave because they wanted L.S. and Bonnie. According to Dankenbring, they were "agitated" and "very hostile," swearing at the defendant and "calling him names." She was "very shocked."

¶ 25    Dankenbring did not see any contact. The defendant was "talking with his hands, and like he was [']you need to leave. You need to leave (indicating),['] and the one officer yelled assault, and I was genuinely surprised because I didn't see where that had happened." After that, the defendant threw his hands into the air and said "I'm cool" and "I'm calm." The other two deputies then "ran up and grabbed each arm, and they played tug of war with [the defendant] until he was on the ground face down in the gravel." From Dankenbring's perspective, the defendant was not struggling but rather "moving a lot" because the deputies "were not clear on who was doing what." The defendant "looked like a puppet being held between two people."

¶ 26    On cross-examination, Dankenbring testified that the deputies were pulling the defendant's arms: "They had his arms behind his back. He was laying on the ground, and they were just moving his arms—he was moving because they were—they didn't know what they were—it seemed to me like they didn't know what they were doing. They were wrestling his arms trying to get them in position and that made him move." She agreed that the deputies took the defendant to the ground but disagreed that they needed to get his arms out in order to handcuff him. Dankenbring stated that "[t]hey had his arms the whole time," and that "[t]hey each grabbed an arm and then they ended up moving away from the house, and he ended up on his stomach." She admitted that she couldn't recall "exactly every move that was made." According to Dankenbring, the defendant used profanity when telling the deputies to leave the property, but "the officer had been using swear words before he had."

¶ 27    On redirect examination, Dankenbring reiterated that, from her perspective, "it looked like [the deputies] were caught—like they were moving [the defendant] more than he was moving. It didn't appear to me that he was resisting or anything. It was just awkward, very awkward."

¶ 28    Oakland testified that on the morning of the incident, he took a shower and turned off the kitchen light on his way downstairs to get dressed. He heard "some loud banging on the door, not banging but like trying to beat it down." He proceeded downstairs to get dressed and answer the door when it opened. He heard Dankenbring's voice and continued dressing. He went back upstairs and saw the defendant outside and Dankenbring behind him.

¶ 29    According to Oakland, the conversation between the defendant and the deputies was "[o]bscenely loud" with "[a] lot of F bombs" from McGrath. At first, the defendant was "calm and collective [*sic*]," but Oakland stated, "the more belligerent this guy got, the more stern my brother got asking the police officer to leave the property." Oakland testified that he did not see the defendant make contact with anyone and that the defendant had not touched anybody

before the deputies grabbed him. When asked again if there was any contact between the defendant and McGrath, Oakland said, "Prior to being apprehended, no." Oakland added, "At the point of Officer McGrath screaming assault that [the defendant] had F'ed up and he was going to jail, the other two officers had grabbed each arm and started playing a tug of war with him[,] walking him away from the house and trying to take him to the ground." Oakland later provided more details: "When [McGrath] said [']you're under arrest, you F'ed up,['] [the defendant] threw his hands up and said [']I'm cool. I'm cool.['] That's when the officers grabbed each arm and started toying with him." Oakland declined to call the defendant's conduct resisting but instead "trying to protect yourself from hitting gravel."

¶ 30    Samantha Russell, the defendant's girlfriend, testified that she and defendant were downstairs in the house asleep with their daughter on the morning of the incident. Around 6:15 a.m. there was "pounding" at the door, so Russell woke up the defendant to "go and see who's knocking" because two officers had visited the house the previous day looking for L.S. and Bonnie. The defendant went upstairs. Five minutes later, Russell went upstairs to check on him. He was in handcuffs. Following the defendant's release from jail, Russell took photos of "scrapes" on his arms and back.

¶ 31    The defendant then testified on his own behalf. He stated that, before the morning of the incident, he had already talked to the police twice about L.S. The girl had seemed depressed after her mother's death, so her grandmother Bonnie had taken her to visit family in the South. The defendant was unsure where and had no way to contact his mother. He did not live with his parents, but he was staying there to help feed livestock while his father was at work and his mother was away.

¶ 32    On October 27, the defendant went to the door wearing only "sweat pants, no socks, no shoes." He recounted the beginning of his interaction with the deputies:

> "I seen [Dankenbring] go to shut the door and put her shoes on and then the door springs back open. I look down in the crack of the door and the officer has his foot in the door so I open the door. I go to step out, and I shut the door, and he says [']you're Montana, right,['] and that was the first thing he says to me. [']You're Montana, right,['] like he was expecting me to be there or I'm the one he wanted to talk to. [']Yes, I'm Montana['] and then every word out of Mohr's mouth was just [']we know your mom's here. You're an F'ing liar. If we have to we'll drag her out by her hair, and she'll never see her grandchild again.['] They said [']this is a serious matter. If we have to we'll get a warrant in five minutes and we'll be back.['] I said [']hold on. You guys need to calm down. You guys are acting like we have your kid here, you know.['] "

¶ 33    According to the defendant, Mohr had the court order in his hand, and he was cussing and yelling. The defendant looked at the order, realized that it was not a search warrant, and handed it back to Mohr. He asserted that he "tried to be as calm as possible and just everything was I was a liar." The defendant described "everything" as "just so irate and just unprofessional." He asked the officers to leave "literally about every 45 seconds." He called them "ridiculous" and added:

> "I don't have to take this stuff. It's [6] o'clock in the morning. I'm going to go inside. If you guys have a warrant, go get your warrant and come in. We'll be here all day. If that's what it takes, I'll just sit here and wait for you guys to come back with a

warrant, and you guys can search the house and find out I'm not lying, that I am telling the truth."

The defendant further testified that he told the deputies his daughter and his brother's daughter were sleeping inside the house. He also told them, "If one of you would like to come in to the house to make sure [Bonnie and L.S.] are not here, by all means." The defendant said that Arthur insisted that all three deputies would have to go together. The defendant looked at the deputies when "all of a sudden I'm being grabbed, you know, and it's like [']what's going on,['] you know. I mean I'm being called a dumb mother F'er, and [']you messed up big time.['] " The defendant denied that he made any contact with McGrath; the defendant was "shocked" when McGrath grabbed him.

The defendant was "pulled off" the doorstep, and the deputies "swung" him into the gravel, where he lost his balance. He testified that he landed on his face. According to the defendant, the deputies were yelling at him, ordering him to quit resisting and put his hands behind his back. The defendant responded, "You guys have both my arms. If you want them behind my back, put them behind my back." The defendant was just "trying not to get hurt on [the] gravel." He denied that he did anything to resist: "[A]s far as squirming, no, I don't believe I was squirming."

On cross-examination, the defendant repeated that Mohr called him a "F'ing liar," insisting that Bonnie was at the house. The defendant agreed that the deputies arrived at the house and started a fight with him for no reason. He also agreed that the deputies dragged him "limp like a rag doll not fighting back for at least 30 feet" through the gravel.

At the close of the defendant's case, the parties entered a stipulation. The parties agreed that if La Salle County sheriff's office Investigator Jason Martin had been called as a witness, he would have testified that he attempted to serve the court order on October 26, 2012, the day before the incident that resulted in the defendant's arrest. Martin also would have testified that he spoke to the defendant at his parents' house and indicated that he thought Bonnie "may have been out running errands or that she may be at her attorney's."

Following closing arguments, the jury began deliberations. At one point, the jury sent a note to the judge, asking "If you tell the police to vacate your property, does this end their authorization, or do they have authority to remain?" The judge referred the jury to the instructions. Thereafter, the jury found the defendant guilty. The defendant made a motion for judgment notwithstanding the verdict, which the trial court denied. The court sentenced the defendant to two years' imprisonment. He appealed.

A divided appellate court panel affirmed. 2015 IL App (3d) 130214. The defendant argued, and the State conceded, that the trial court erred in asking potential jurors whether they had any "problems" with the *Zehr* principles. *Id.* ¶ 37. Under Rule 431(b), the trial court should have asked whether jurors understood and accepted those principles. *Id.* (citing *People v. Thompson*, 238 Ill. 2d 598, 607 (2010)). Because the defendant did not object, the issue became whether his forfeiture could be excused under the plain error doctrine. On that issue, the appellate court offered three views.

Justice Schmidt, in the lead opinion, initially noted that the defendant must seek relief under the first prong of the plain error doctrine because a Rule 431(b) violation is not cognizable under the second prong. *Id.* ¶ 39 (citing *Thompson*, 238 Ill. 2d at 610-11, and *People v. Belknap*, 2014 IL 117094, ¶ 47). Justice Schmidt agreed with the State that the

evidence was "not so closely balanced that the trial court's error warrants reversal." *Id.* ¶ 40. Justice Schmidt reviewed the State's "persuasive evidence," including the testimony of the three deputies, which detailed "essentially the same sequence of events." *Id.* ¶ 41.

¶ 41 Justice Schmidt then turned to the defendant's argument. The defendant contended, based upon this court's holding in *People v. Naylor*, 229 Ill. 2d 584, 608 (2008), that evidence is closely balanced when it involves a credibility contest. 2015 IL App (3d) 130214, ¶ 42. Rather than relying upon *Naylor*, however, Justice Schmidt discussed *Belknap*, where this court stated that " 'a reviewing court must undertake a commonsense analysis of all the evidence in context' " under the first prong. *Id.* (quoting *Belknap*, 2014 IL 117094, ¶ 50). He concluded, "Utilizing that contextual commonsense analysis here, it is apparent that defendant's witnesses are less than credible." *Id.* ¶ 43. Specifically, Dankenbring's initial statement to the police that no one else was in the house was incorrect because the defendant, Russell, and Oakland were there. *Id.* And the State impeached the defendant's credibility with Martin's stipulated statement. *Id.*

¶ 42 Justice Schmidt did not stop there. He discussed *People v. White*, 2011 IL 109689, and *People v. Adams*, 2012 IL 111168, where this court "explained that plain-error analysis under the first prong may involve more than just a rigid determination of whether an error occurred and if the evidence was closely balanced." 2015 IL App (3d) 130214, ¶ 47. According to Justice Schmidt, *White* posited that a defendant making a first-prong plain error argument, like a defendant making an ineffective assistance of counsel argument, must show prejudice. *Id.* (quoting *White*, 2011 IL 109689, ¶ 133). That is, a defendant must show that the evidence was so close that the error alone tipped the scales of justice. *Id.* According to Justice Schmidt, "the parties and many court watchers" expected this court to resolve any confusion about whether a defendant must show prejudice under the first prong in *Belknap*, but the court instead "punted" and "sidestepped" the issue, threatening more problems. *Id.* ¶¶ 48-49, 52.

¶ 43 Justice Schmidt then offered his view—or what he labeled "*dicta* of the rankest form." *Id.* ¶ 51 n.1. He asserted, "the weight of the evidence *** is irrelevant to the issue of whether or not defendant received a fair and impartial jury through the process of *voir dire*." *Id.* ¶ 50. Stated differently, Rule 431(b) violations have "absolutely no bearing on the closeness of the evidence." *Id.* ¶ 51. Such an error is "not evidentiary and, therefore, unable to 'tip the scales' in a closely balanced case." *Id.* ¶ 53. Consequently, Justice Schmidt would require a defendant to show not only that the evidence was closely balanced but also that the error was prejudicial—that "but for the error, the outcome of the trial would likely be different." *Id.* ¶¶ 51, 53. Justice Schmidt believed that approach comports with *People v. Herron*, 215 Ill. 2d 167, 187 (2005). 2015 IL App (3d) 130214, ¶ 52. Additionally, he believed that approach destroys a perverse incentive for defense counsel to "sit silent rather than object in closely balanced cases" because it will be easier to obtain a reversal via a first-prong plain error argument. *Id.* ¶ 53.

¶ 44 In a special concurrence, Justice Holdridge agreed with Justice Schmidt that the evidence against the defendant was not closely balanced. *Id.* ¶ 67 (Holdridge, J., specially concurring). Justice Holdridge disagreed with Justice Schmidt that the first-prong plain error standard requires a showing of prejudice. Under *Herron*, any error in a closely balanced case is prejudicial. *Id.* ¶ 68 (citing *Herron*, 215 Ill. 2d at 193). According to Justice Holdridge, *White* is consistent with *Herron*. *Id.* ¶ 69 (" '*White* does not upend the established principle that if a

defendant shows that there was error and that the evidence was closely balanced *** the error is both prejudicial and reversible and no further showing of actual prejudice is required.' " (quoting *People v. Vesey*, 2011 IL App (3d) 090570, ¶ 19)). Justice Holdridge added that he believes this court should reconsider *Thompson* and allow Rule 431(b) violations to proceed under the second prong. *Id.* ¶ 72.

¶ 45    Justice O'Brien dissented, arguing that, under *Naylor*, the evidence in this credibility contest was closely balanced, so the defendant was entitled to a new trial. *Id.* ¶ 74 (O'Brien, J., dissenting).

¶ 46    This court allowed the defendant's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Jan. 1, 2015).

¶ 47                                                    ANALYSIS

¶ 48    To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion. *Belknap*, 2014 IL 117094, ¶ 66 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)). Failure to do either results in forfeiture. There is, however, a well-established exception to that principle. Illinois Supreme Court Rule 615(a) provides that insubstantial errors "shall be disregarded" but that substantial or what have become known as plain errors "may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). As the language of the rule indicates, a reviewing court may exercise discretion and excuse a defendant's procedural default. *People v. Clark*, 2016 IL 118885, ¶ 42. We have traditionally identified two instances when it is appropriate to do so: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (quoting *Herron*, 215 Ill. 2d at 186-87). We recently reaffirmed this view of the plain error doctrine. See *People v. Fort*, 2017 IL 118966, ¶ 18 (quoting *Herron*, 215 Ill. 2d at 186-87).

¶ 49    The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial. *Piatkowski*, 225 Ill. 2d at 565. As they did in the appellate court, the parties agree that the trial court violated Rule 431(b). That rule requires the trial court to ask potential jurors whether they understand and accept the four *Zehr* principles. Here, the trial court asked jurors whether they "had any problems with" or "believed in" those principles. That was a clear error. *People v. Wilmington*, 2013 IL 112938, ¶ 32; *Thompson*, 238 Ill. 2d at 607.

¶ 50    The next step under the plain error doctrine depends upon the defendant's argument. Where the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. *Herron*, 215 Ill. 2d at 187 (citing *People v. Keene*, 169 Ill. 2d 1, 17 (1995)); see *Clark*, 2016 IL 118845, ¶ 46. If the defendant carries that burden, "[p]rejudice *** is presumed because of the importance of the right involved." *Herron*, 215 Ill. 2d at 187.

- 11 -

¶ 51    Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice. *Id.* If the defendant carries that burden, prejudice is not presumed; rather, "[t]he error is actually prejudicial." *Id.* at 193; accord *Piatkowski*, 225 Ill. 2d at 566 ("defendant must meet his burden to show that the error was prejudicial—in other words, he must show that the quantum of evidence presented by the State against the defendant rendered the evidence 'closely balanced' ").

¶ 52    A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury. *Wilmington*, 2013 IL 112938, ¶ 33 ("[T]he second prong of plain-error review does not provide a basis for excusing defendant's procedural default" of a Rule 431(b) violation. (citing *Thompson*, 238 Ill. 2d at 615)). Here, the defendant has presented no such evidence and acknowledges that "prevailing precedent" limits his plain error argument to the first prong, under which we have analyzed unpreserved Rule 431(b) violations. See *Belknap*, 2014 IL 117094, ¶ 47; *Wilmington*, 2013 IL 112938, ¶ 34.[2] As we did in *Belknap* and *Wilmington*, we turn to the trial evidence because a requisite to relief under the first prong is a finding that that evidence was closely balanced.

¶ 53    In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. *Belknap*, 2014 IL 117094, ¶¶ 52-53; see *White*, 2011 IL 109689, ¶ 139; *Adams*, 2012 IL 111168, ¶ 22. That standard seems quite simple, but the opposite is true. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility.

¶ 54    Here, the defendant was charged with resisting a peace officer under section 31-1(a), (a-7) of the Criminal Code of 1961. That section provides:

> "(a) A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his [or her] official capacity commits a Class A misdemeanor.
>
> ***
>
> (a-7) A person convicted for a violation of this Section whose violation was the proximate cause of an injury to a peace officer *** is guilty of a Class 4 felony." 720 ILCS 5/31-1(a), (a-7) (West 2010).

The statute required the State to prove that the defendant knowingly resisted an authorized act by someone that he knew was a peace officer and, in doing so, proximately caused an injury to the officer. Thus, the relevant evidence at the defendant's trial involved two elements: whether the defendant knowingly resisted the deputies' actions in arresting him for battery to a police officer and, if so, whether that conduct proximately caused Mohr's injury.

¶ 55    On the first element, knowing resistance, McGrath testified that after the defendant poked him, he reached for the defendant's wrist. According to McGrath, the defendant "pulled away and resisted arrest." As the deputies attempted to gain control of the situation, the defendant

---

[2]Our analysis in those cases reveals that a majority of this court has now twice disagreed with the suggestion that the first prong is "inappropriate for determining whether the failure to ask a question at *voir dire* amounts to plain error." *Belknap*, 2014 IL 117094, ¶ 88 (Burke, J., specially concurring, joined by Freeman, J.).

continued to "thrash[ ] his body about trying to get away and resist arrest." McGrath stated that the deputies told the defendant to stop resisting. On cross-examination, McGrath reiterated that the defendant "resisted when I told him he was arrested."

¶ 56    Mohr testified that the defendant resisted by "pulling away" and "lurching around." Mohr added that the defendant did not comply when the deputies ordered him to put his hands behind his back, and during a 20-second struggle on the ground, the defendant tried to pull his hands under his body. Arthur provided less detail, stating merely that the defendant "resisted, and he was taken to the ground." While Arthur restrained the defendant's feet, McGrath and Mohr got his arms "out from underneath him."

¶ 57    Dankenbring testified that when one deputy "yelled" assault, the defendant threw his arms in the air, insisting "I'm cool" and "I'm calm." The deputies then played "tug of war" with the defendant "like a puppet being held between two people" until he was facedown in the gravel. From her perspective of the "awkward" encounter, the defendant was not resisting. The defendant was "moving a lot" but only because the deputies "were not clear on who was doing what." On cross-examination, Dankenbring admitted that she could not recall "exactly every move," but the deputies "were wrestling [the defendant's] arms to get them in position and that made him move." She added that the deputies did not need to get the defendant's arms out from underneath him in order to handcuff him. Oakland testified that when McGrath "scream[ed]" assault, the defendant threw his arms in the air and said "I'm cool." The deputies then grabbed the defendant's arms and began "toying" and playing tug of war with him. Oakland refused to describe the defendant's conduct as resisting but rather as "trying to protect yourself from hitting gravel."

¶ 58    The defendant testified that he was shocked when the deputies grabbed him. He acknowledged that the deputies were ordering him to quit resisting, but he denied that he was resisting or even "squirming." He was only "trying not to get hurt on the gravel." The deputies had his arms, and the defendant told them that if they wanted his arms behind his back, then they should put them there.

¶ 59    On the second element, proximate cause, McGrath testified that he noticed scratches on both of Mohr's hands after the deputies had handcuffed and placed the defendant in a squad car. On cross-examination, McGrath stated that he did not know how Mohr was injured. Mohr testified that the deputies took the defendant to the ground and he tried to pull his hands under his body. Mohr's hands were between the defendant and the gravel driveway. According to Mohr, the deputies had to "get under" the defendant to get ahold of him and pull out his hands in order to handcuff him. After that, Mohr noticed scratches on his hands. He could not say with certainty that the gravel caused the scratches, and he could not say with certainty that McGrath or Arthur did not grab his arms during the struggle with the defendant, though he did not believe they did. Arthur testified that McGrath and Mohr got the defendant's arms out from under his body. Arthur did not mention what may have caused Mohr's injuries. The State offered photographs of Mohr's hands, but they only corroborated the existence of his injuries, not their cause.

¶ 60    The defendant argues that the evidence was closely balanced because both parties presented plausible versions of events. The State responds that it presented ample, persuasive evidence of the defendant's guilt. The issue before us, however, does not involve the sufficiency of close evidence but rather the closeness of sufficient evidence. See *Piatkowski*,

225 Ill. 2d at 566 ("Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge."). In that regard, the State argues that the evidence was not closely balanced because "there was no real contest between the two accounts." The State's argument is threefold. According to the State, the deputies' accounts were consistent, credible, and corroborated; the accounts of the defendant and his witnesses were inconsistent, incredible, and uncorroborated; and the defendant's witnesses were biased in his favor.

¶ 61     We reject the State's argument. A commonsense assessment of the evidence reveals that it was closely balanced. The deputies' testimony was largely consistent, but so was the testimony of the defendant and his witnesses. Minor inconsistencies clouded the testimony on both sides, but neither the prosecution nor the defense accounts of that morning's events were fanciful. The State asserts that Russell was not present during the arrest and Oakland and Dankenbring were "absent" for significant portions of the events, so their testimony did not corroborate the defendant's testimony. The State mischaracterizes the evidence. Russell was not present for the confrontation between the deputies and the defendant, but Oakland and Dankenbring watched as the defendant was seized by the deputies. Their descriptions of the defendant's conduct—namely, his lack of resistance—corroborated his own testimony.

¶ 62     The State contends that the defendant's witnesses were potentially biased in his favor because they were family members and friends. Russell was the defendant's girlfriend, Oakland was his brother, and Dankenbring was his brother's ex-girlfriend, but those are precisely the type of people likely to be with the defendant at 6 a.m. and likely to testify on his behalf in a trial concerning what happened at that time. Their account of the events is no less plausible than the deputies' account, and neither version is supported by corroborating evidence.

¶ 63     As in *Naylor*, the outcome of this case turned on how the finder of fact resolved a "contest of credibility." *Naylor*, 229 Ill. 2d at 606-07. There, we stated, "Given these opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant." *Id.* at 607. We determined that because both versions were credible, the evidence was closely balanced. *Id.* at 608. We reach the same conclusion here.

¶ 64     Typically, that conclusion would end our inquiry because a defendant who has shown clear error and closely balanced evidence has shown prejudice and is entitled to relief under the first prong of the plain error doctrine. See *Piatkowski*, 225 Ill. 2d at 568 ("defendant has met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial"); *Herron*, 215 Ill. 2d at 193 ("When there is error in a close case, we choose to err on the side of fairness, so as not to convict an innocent person."). The State disagrees. According to the State, "the closeness of the evidence is an important consideration in determining whether there was prejudice, but it is not the only consideration." The State's argument in this case parrots its losing argument in *Herron*. There, the State bemoaned broad problems in our plain error jurisprudence because a reviewing court's finding that the evidence was closely balanced cloaked the case in " 'a presumption of prejudice.' " *Herron*, 215 Ill. 2d at 179. Here, the State complains that the defendant's "formulation of the plain error test" requires no showing of prejudice and, instead, asks this court to "presume prejudice from the

- 14 -

closeness of the evidence." In effect, the State urges us to roll back our unanimous holdings in *Herron* and *Piatkowski* and require something more for plain error. What the State proposes is tacking the seriousness requirement of the second prong onto the closeness requirement of the first prong to yield a hybrid requirement. Under that scenario, a defendant would have to demonstrate not only that the evidence was closely balanced but also that the error was so substantial—as opposed to *de minimis*—that it may have affected the verdict.

¶ 65    After reminding us that "[a] defendant is not entitled to an error-free trial and few trials are free from error" (*People v. Peter*, 55 Ill. 2d 443, 447 (1973)), the State catalogs certain trivial errors that "could not possibly impact the outcome of the case," including a typographical mistake in a jury instruction. To the State, the Rule 431(b) violation here was similar to such errors because it had "nothing to do with the jury's evaluation of credibility, but rather its understanding of the Rule 431 principles." Consequently, the State contends, the error did not prejudice the defendant.

¶ 66    An instructional error may not bear upon the evidence yet may still affect the verdict because it relates to "the manner in which a jury was instructed to evaluate that evidence." *In re M.W.*, 232 Ill. 2d 408, 438 (2009). In *Herron*, the error concerned an instruction on how the jury should weigh eyewitness identification testimony. *Herron*, 215 Ill. 2d at 193-94. The error was not improperly admitting a piece of evidence on the defendant's side of the proverbial scales of justice but rather improperly directing the jury on how to use the scales. We held that the defendant was entitled to a new trial because the error may have been outcome-determinative where the evidence was closely balanced. *Id.* at 194 ("[t]he jury's verdict may have been different with a different instruction").

¶ 67    Like the error in *Herron*, a Rule 431(b) violation is also an instructional error. In response to our holding in *Zehr*, Rule 431(b) was designed to ensure that the defendant has a fair and impartial jury—a jury that understands and accepts four important constitutional principles:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

The trial court's questions about those principles, particularly the defendant's presumption of innocence and the State's burden of proof, constitute preliminary instructions to potential jurors on how they must evaluate the evidence, so a Rule 431(b) violation may affect the verdict. If jurors do not understand and accept that the defendant is presumed innocent, then credibility contests could lean in the State's favor, which could tip the scales of justice against the defendant in a close case. Or if jurors do not understand and accept that the State bears the burden of proof beyond a reasonable doubt, then, again, credibility contests could lean in the State's favor, which also could tip the scales of justice against the defendant in a close case. A jury that does not understand and accept those principles may weigh the evidence in favor of the State or render a guilty verdict on insufficient proof, again tipping the scales against the defendant in a close case.

¶ 68    The State is correct in its contention that a defendant must show prejudice to obtain relief under the first prong of the plain error doctrine. As our cases clearly indicate, though, prejudice rests not upon the seriousness of the error but upon the closeness of the evidence. What makes

an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive. See *Herron*, 215 Ill. 2d at 187 (defining "prejudicial error" as error that alone severely threatened to tip the scale of justice against the defendant because the evidence was so closely balanced); accord *White*, 2011 IL 109689, ¶ 133 (stating that a defendant must show prejudice in that the evidence was so closely balanced that the verdict may have resulted from the error and not the trial evidence (citing *Herron*, 215 Ill. 2d at 178)). There lies the core of our first-prong plain error jurisprudence, which has remained unchanged since *Herron*. See *Fort*, 2017 IL 118966, ¶ 18 (citing *Herron*, 215 Ill. 2d at 186-87).

¶ 69    Thus, whether a Rule 431(b) violation is trivial or *de minimis*—and we have repeatedly stated that it is neither[3]—is simply the wrong inquiry. The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced. We reject the State's argument that we should abandon our definition of prejudicial error in *Herron* and *Piatkowski* and graft an additional substantiality aspect onto it. Plain errors by definition are substantial. See Ill. S. Ct. R. 615(a).

¶ 70    The State finds it "odd" that, without a retooled requirement of prejudice under the first prong, a defendant in a close case who does not object would be in stronger position before a reviewing court than a defendant who did object. The former defendant could obtain a reversal for a trivial error under the plain error doctrine, while the latter defendant could not under the harmless error doctrine. The State posits, "This would give defense attorneys an improper incentive to 'sit on their hands' and allow errors to unfold without objection in the trial court if they believed the evidence to be closely balanced."

¶ 71    The State's concern is fanciful and denigratory to the defense bar. It defies logic to suggest that defense counsel would decline to object to a possible trial error in the strategic hope that, once the defendant was convicted and sentenced, a reviewing court would conclude that the error was clear and the evidence was closely balanced and would order a new trial. Illinois case law demonstrates that such an assumption would be a foolhardy gamble with the defendant's liberty.

¶ 72    This case involves little more than a straightforward application of precedent. Under *Wilmington* and *Belknap*, we hold that a clear Rule 431(b) violation is cognizable under the first prong of the plain error doctrine. Under *Herron* and *Piatkowski*, we hold that the defendant is entitled to relief from a clear Rule 431(b) error because he has demonstrated that the evidence was closely balanced.

¶ 73    Finally, we address Justice Burke's dissent. The dissent mentions the requirements of Rule 431(b), then points to a presumption that "the jury follows IPI Criminal 4th No. 2.03, even when the trial court has violated Rule 431(b)." *Infra* ¶ 98. Justice Burke's dissent asserts that "any analysis of whether a Rule 431(b) 'instructional error' requires reversal of a defendant's conviction must begin first with asking what effect an instruction given at the close of trial has on that error." *Infra* ¶ 104. According to the dissent, *Glasper* and *Thompson* both purportedly

---

[3]See *Zehr*, 103 Ill. 2d at 477 (holding that questions on certain "basic guarantees" are "essential" and "vital"); *People v. Glasper*, 234 Ill. 2d 173, 189 (2009) ("the decision to question the venire in accordance with Rule 431(b) is not discretionary—it is a requirement" because our rules "are not mere suggestions"); *Thompson*, 238 Ill. 2d at 611 ("compliance with Rule 431(b) is important"), 618-19 (Burke, J., dissenting, joined by Freeman, J.) (stating that Rule 431(b) questioning "could not be deemed dispensable").

held that if IPI Criminal 4th No. 2.03 was given, "we must presume that the jury followed the instruction, even if Rule 431(b) was violated during *voir dire*." *Infra* ¶ 120. Here, the jury received such instructions. Consequently, opines the dissent, there was no error, no plain error, and no basis for reversing the defendant's conviction. *Infra* ¶ 120 (citing *People v. Hopp*, 209 Ill. 2d 1, 12 (2004)). Our opinion then is "directly at odds" with *Glasper* and *Thompson* and, in fact, overrules them. *Infra* ¶¶ 98, 133.

¶ 74    The dissent's argument is simple to dismiss for several reasons. First, the dissent seriously mischaracterizes the holdings in *Glasper* and *Thompson*. Neither case held that instructions at the close of trial cure a clear Rule 431(b) violation. Though the juries in both cases received such instructions, the court found clear Rule 431(b) violations. See *Glasper*, 234 Ill. 2d at 189 ("The trial court's refusal to ask the question was a clear violation of Rule 431(b)(4) and this court's mandate in *Zehr*."); *Thompson*, 238 Ill. 2d at 607 ("we necessarily conclude that the trial court violated Rule 431(b)").

¶ 75    The *Glasper* court held "a violation of Rule 431(b) *** does not require automatic reversal and is amenable to harmless error review." *Glasper*, 234 Ill. 2d at 200. Applying that holding, the court determined that the error was indeed harmless because the evidence against the defendant was overwhelming. *Id.* at 202-03. Although the court did allude to the presumption that juries follow instructions, the court did not hold that close-of-trial instructions completely remedy a Rule 431(b) violation. If the court had done so, there would have been no need to consider whether the error was harmless. There would have been no error.

¶ 76    The *Thompson* court relied upon *Glasper* and held "the trial court's violation of the amended version of Supreme Court Rule 431(b) *** does not fall within the very limited category of structural errors and, thus, does not require automatic reversal of defendant's conviction." *Thompson*, 238 Ill. 2d at 611. The court further held that the defendant did not establish that "the trial court's violation of Rule 431(b) resulted in a biased jury," so he "failed to meet his burden of showing the error affected the fairness of his trial and challenged the integrity of the judicial process," foreclosing relief under the second prong of the plain error doctrine. *Id.* at 615. As in *Glasper*, there would have been no need to consider whether the error was structural or plain, if it had been cured.

¶ 77    The comments in *Glasper* and *Thompson* that the dissent finds so compelling do not discuss or even cite *Zehr*, so we refuse to find in them a *sub silentio* abrogation of our statement in that case about the negligible effect of instructions at the close of trial. *Zehr*, 103 Ill. 2d at 477 ("an instruction given at the end of the trial will have little curative effect"); see also *Glasper*, 234 Ill. 2d at 227 (Burke, J., dissenting, joined by Freeman, J.) (noting that *Zehr*-type questions go "to a critical area of potential bias that cannot be ameliorated by admonitions or instructions"). The key point of *Glasper* and *Thompson* is unremarkable: A Rule 431(b) violation does not necessarily result in a biased jury. We do not dispute that point; we merely answer a different question. The question in *Glasper* was whether a violation of the pre-amended version of Rule 431(b) was *per se* reversible error. We answered that question in the negative. The questions in *Thompson* were (1) whether a violation of the amended version of Rule 431(b) was *per se* reversible error and (2) whether such a violation was reversible error under the second prong of the plain error doctrine. We also answered those questions in the negative.

¶ 78    The question here is whether a clear Rule 431(b) violation is reversible error under the first prong, where the defendant demonstrates that the trial evidence was close. We answer that question in the affirmative. In doing so, we make no assumption regarding jury bias. There is a difference between a finding of bias and a recognition of its potentiality. It is not inevitable that a jury who receives faulty instructions on the *Zehr* principles is biased (see *Glasper*, 234 Ill. 2d at 201; *Thompson*, 238 Ill. 2d at 610), but it is possible. And if it is possible, it is also possible that those faulty instructions contributed to the result. The seriousness of the risk that they may have done so "depends upon the quantum of evidence presented by the State against the defendant." *Herron*, 215 Ill. 2d at 193. As in *Herron*, we conclude that, because the evidence was so closely balanced, the trial court's clear instructional error alone may have tipped the scales in favor of the State. We choose to err on the side of fairness and remand for a new trial.

¶ 79                                    CONCLUSION

¶ 80    For the reasons that we have stated, we reverse the judgment of the appellate court and remand for further proceedings.


¶ 81    Reversed and remanded.


¶ 82    CHIEF JUSTICE KARMEIER, dissenting:

¶ 83    In this, the fifth in a series of cases involving Rule 431(b) violations and the consequences of the varying degrees of noncompliance, we are still grappling with the nature and significance of the violation itself—indeed, whether there is an error that even survives proper instruction at the close of the trial.

¶ 84    Justices Burke and Freeman feel compelled, by principles of *stare decisis*, to follow their interpretation of this court's holdings in *Glasper* and *Thompson*, and they accordingly conclude, from the *Glasper* analysis, that any error is cured by appropriate instructions given the jury at the close of the case. *Infra* ¶ 98. The majority, on the other hand, notes that our jurisprudence acknowledges *some* kind of error survives applicable instructions given the jury at the close of the case; otherwise, we would not have engaged in harmless error analysis in *Glasper* and subsequently plain error analysis in *Wilmington* and *Belknap*. *Supra* ¶¶ 75-76. With respect to first-prong plain error analysis, the majority finds that the evidence in this case is closely balanced—the first such case we have encountered in this context—which has prompted, in the majority opinion, an examination of the nature of the Rule 431(b) violation in the first-prong equation. The majority's analysis *suggests* that the magnitude of the Rule 431(b) violation is of no consequence, that even a *de minimis* Rule 431(b) violation would be enough to require reversal in a closely balanced evidence case.[4] There is, of course, necessity

_____

[4]The majority, in this context, displays situational fidelity to the *Zehr* decision, citing it for the proposition that *a* Rule 431(b) violation—not specifically this one—is neither "trivial [n]or *de minimis*." *Supra* ¶ 69. The majority also claims the State's argument, that the "substantiality" of the error is relevant to the disposition of a closely balanced evidence case, was rejected years ago in *Herron* and *Piatkowski*. If that were so, it seems this court would have ended its discussion of the Rule 431(b) violation in *Belknap* differently. Instead, the court suggested the issue had *not* been resolved: "Because we find that the evidence was not closely balanced, we need not address the State's argument that a further showing that the error itself likely had some impact on the jury's verdict must be made in

in that suggestion, because the court does not want to frankly address the reality that the error—if there was error—did not affect the outcome of this case at all.

¶ 85    There is no doubt that early emphasis of the *Zehr* principles, during *voir dire*, is a good idea, but we have, in the process of formulating and reformulating Rule 431(b) and reviewing its applications, required a too-rigid adherence to its prescriptive language and placed far too much emphasis on its importance. Was the impartiality of jurors suspect—was their ability and willingness to follow the law given them presumptively in doubt—before 1997, when the on-demand version of Rule 431(b) was first adopted? Was it before the mandatory version became effective in 2007? Was it even before *Zehr*?

¶ 86    We have come to *stringently* apply the rule's language in determining whether a violation of Rule 431(b) has occurred. *Cf. Wilmington*, 2013 IL 112938, ¶ 32 (finding error in the trial court's failure to ask jurors if they understood three of the Rule 431(b) principles and in failing to even inquire regarding the jury's understanding and acceptance of the principle that defendant's failure to testify could not be held against him). I now believe—as our intra-court difference over the nature and consequences of a violation drags on—that compliance with the rule should not require mouthing of the precise words of the rule, by either the court or the jurors. Alternatively, the degree of noncompliance should be taken into account in determining whether reversal is warranted.

¶ 87    We who have been in the majority in *Glasper*, *Thompson*, *Wilmington*, and *Belknap* have not taken a hard look at the impact of a Rule 431(b) violation—other than to conclude it does not rise to the level of structural error or second-prong plain error—and the correlative degree of trial court noncompliance, until this case, because the evidence in prior cases was such that we were not required to do so. The evidence against the defendant was always overwhelming. The impact of noncompliance could thus be assessed via *Rivera*-like, rational-juror analysis.[5] However, taking that hard look now, I disagree with the majority's suggestion that *any* noncompliance, no matter how trivial, should prompt reversal, in a case where there is adequate evidence to convict and no indication whatsoever that any juror was biased or prejudiced. Therefore, I must respectfully dissent.

¶ 88    The trial judge in this case repeated, multiple times, the four *Zehr* principles and then asked individual jurors whether they "[h]ad any problems" with or "believe[d] in" those principles, to which they replied, individually, "no" or "yes," respectively. The judge also asked whether anything would prevent them from being fair and impartial, to which they responded "no." Thus, the record suggests that no disagreement, concern, or bewilderment was expressed by any juror. In other words, they understood and accepted the four *Zehr* principles. Given these facts, is there really any doubt that the jurors who tried defendant were anything other than fair and impartial or that they proceeded within the principled framework set for them at the outset by the court? If I were to ask someone whether they have "any problems" with a particular position or proposition, I think they would understand I was asking whether they disagree with, or suffer from any confusion regarding, that position or proposition. If they respond "no," I would assume they neither disagree nor are they confused. If I were to ask someone whether

---

first-prong plain error cases." *Belknap*, 2014 IL 117094, ¶ 62. Had it been resolved, a simple reference to *Herron* and *Piatkowski* would have been in order.

[5]See *People v. Rivera*, 227 Ill. 2d 1 (2007), *aff'd*, 556 U.S.148 (2009).

they "believe in" a particular principle and they respond "yes," I would interpret that to mean they accept that principle. That they understand it to "believe in" it would be implicit. At some point—and I submit it is at this point—common parlance and the dynamics of real-world interaction should prevail. Requiring an obligatory, mechanical verbal response from each of the jurors, in the precise words of the rule, that they *accept* the *Zehr* principles and a, perhaps, mildly insulting acknowledgement that they are possessed of a modicum of intelligence such that they *understand* those—generally (and I will elaborate on that qualification in a moment)—straightforward and easily understood propositions is simply not necessary. I would find—abandoning pedantic insistence on the literal vernacular of the rule—that the trial court in this case complied with the spirit and intent of Rule 431(b), if not its letter. I would alternatively find that the character of any error was not such that reversal is required. Yes, I would find that the character of the error may, in some limited instances, such as here, make a difference in the first-prong error equation.

¶ 89    Since I have chosen to go here, I have other, related observations to make.

¶ 90    The *one* concept of the four *Zehr* principles that jurors would likely find difficult to understand is reasonable doubt, yet we have repeatedly—and indeed fairly recently—held that a trial court cannot offer jurors any guidance in that respect whatsoever—even when they express confusion and ask. We define proof by a "preponderance of the evidence" for juries in criminal cases. See *People v. Parker*, 223 Ill. 2d 494, 508-09 (2006); IPI Criminal 4th No. 4.18. We define the phrase "clear and convincing evidence" for juries considering whether a criminal defendant has established an insanity defense. IPI Criminal 4th No. 4.19. We do *not*, however, define "reasonable doubt," the highest standard of proof, the standard that governs whether liberty is taken away, in many instances for substantial portions of a person's lifetime. That, we have repeatedly left for jurors to decide without *any* guidance, suggesting that the term "needs no definition because the words themselves sufficiently convey its meaning." *People v. Downs*, 2015 IL 117934, ¶ 24. Thus, if a juror were to express confusion, during *voir dire* questioning, regarding the concept of reasonable doubt, how, exactly, would a trial court clarify that juror's understanding? It is a juror's willingness to vote for acquittal, when the State does not prove a defendant guilty "beyond a reasonable doubt," that the *Zehr* court considered "vital to the selection of a fair and impartial jury." See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). I would submit, if we need to know, at the outset, that the jurors understand and accept the simpler *Zehr* principles, then we should explain, right up front, what the all-important reasonable doubt standard means.

¶ 91    In *In re D.T.*, 212 Ill. 2d 347, 362 (2004), this court made clear that standards of proof are indeed consequential:

> " 'The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "*instruct the factfinder* concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." ' *Addington v. Texas*, 441 U.S. 418, 423, 60 L. Ed. 2d 323, 329, 99 S. Ct. 1804, 1808 (1979), quoting *In re Winship*, 397 U.S. 358, 370, 25 L. Ed. 2d 368, 379, 90 S. Ct. 1068, 1076 (1970) (Harlan, J., concurring)." (Emphasis added.) *D.T.*, 212 Ill. 2d at 355.

So, we need jurors to understand, at the outset, the four *Zehr* principles, but we are willing to assume they have some innate understanding of the legal concept we call reasonable doubt?

¶ 92    While we are considering important trial principles—those upon which the outcome of a case may depend—how about some others that potential jurors must be willing to follow and apply? Why not get their assurances, at the outset, that they will apply those as well? We need jurors who are willing and able to consider evidence admitted for a limited purpose only for that purpose. For example, it would, of course, be problematic if a juror were to consider a defendant's prior conviction—perhaps one of the same character as the offense for which he is on trial—admitted for the limited purpose of impeachment, as evidence of his propensity to commit the charged offense as well. The jurors have to be able to put aside any tendency to assume, "he did it before, he must have done this too," and follow the court's instruction. That same principle applies in a broad range of circumstances arising during a trial. Another example: evidence is adduced; there is an objection; the objection is sustained. It is often said you cannot unring the bell, but that is precisely what jurors are instructed to do: not consider what they have heard. In addition, we need jurors who are able to separate the sometimes eloquent and passionate arguments of the attorneys from the evidence that is actually heard and admitted, disregarding the arguments where they are not supported by the evidence. These, too, are critical qualifications that jurors must possess. If they have biases or prejudices in these regards, it would seem equally important that we be aware of them before trial begins. Once you start down this road, how far do you go?

¶ 93    Moreover, beyond all that, I think we must recognize there is no absolute certainty when it comes to the innate attitudes, propensities, and candor of 12 people who will sit in judgment of another. As we noted in *People v. Rivera*, 227 Ill. 2d 1, 16 (2007), quoting in part from Justice Scalia's majority opinion in *Holland v. Illinois*, 493 U.S. 474, 484 (1990), peremptory challenges are considered an important right because "by enabling each side to exclude those jurors it believes will be most partial toward the other side," they are "a means of eliminat[ing] extremes of partiality on both sides" thereby "assuring the selection of a qualified and unbiased jury." (Emphasis and internal quotation marks omitted.) We immediately thereafter quoted, approvingly, from Justice Scalia's dissent in *Powers v. Ohio*, 499 U.S. 400, 425 (1991) (Scalia, J., dissenting, joined by Rehnquist, C.J.), wherein he described the peremptory challenge as "a means of winnowing out possible (though not demonstrable) sympathies and antagonisms on both sides, to the end that the jury will be the fairest possible." I would note, as this court did in *Glasper*, notwithstanding our recognition of this "important right," intended to assist the parties in picking jurors as "qualified," "unbiased," and "fair" as possible, a right secured to the parties by rule, we nevertheless found a violation of that rule harmless. But more to the point is our acknowledgement that even jurors who are not excusable for cause, who have answered questions appropriately, who we would consider legally qualified, may still harbor some residual—"though not demonstrable"—"sympathy or antagonisms."

¶ 94    In the end, distilled to its essence, it is the pledge and commitment of the jurors to be fair and impartial in the application of the legal principles they are given and the unanimity required to support a conviction that give us some assurance of a just result. Looking at it that way and taking a commonsense approach to the interaction between the trial judge and the jurors in this case, I think the defendant got the fair trial, by qualified jurors, that he deserved. There is a distinction that probably should have been made in our two prior decisions but bears making now, at least, that we are not talking about an error that occurred at trial—for example, an evidentiary error that might have tipped the balance in the prosecution's favor or prosecutorial error that might have unduly influenced the perspective from which the jurors

viewed the case or that may have evoked emotions capable of overcoming their rational deliberation. We are talking about a relatively minor variance in the implementation of a rule intended to *help* ensure the selection of fair and impartial jurors who will follow the law given them. The trial judge accurately, repeatedly, described the four *Zehr* principles for the jurors and, although neither they nor he used the precise language of the rule, *i.e.*, "understand" and "accept," their responses make clear that they did both of those things *and* that they thought they could be fair and impartial. I am now convinced that should be enough.

¶ 95　　　In *People v. Thompson*, 238 Ill. 2d 598, 614 (2010), this court stated: "We cannot presume the jury was biased simply because the trial court erred in conducting the Rule 431(b) questioning." The majority in this case now dispenses with "presumption" and seizes upon "potentiality" of bias and "faulty instructions" to reverse. *Supra* ¶ 78. The real-world "potentiality" in this case is nil, *sub silentio* recognition of which accounts for the majority's suggestion that even "*de minimis* or trivial" error would require reversal in a closely balanced evidence context. The extent to which the "instructions" were "faulty" is inconsequential. Given the facts of this case, I simply cannot countenance overturning the conviction that resulted from the unanimous verdict of these 12 jurors. This violation is simply not enough.

¶ 96　　　Taking a broader view, there are times when this court must reevaluate a course of analysis. In *People v. Sharpe*, 216 Ill. 2d 481, 516-21 (2005), for example, this court abandoned the cross-comparison analysis, in review of claims brought under the proportionate penalties clause, concluding that the analysis was "problematic" and "unworkable." It is time to take a step back from the course the *Zehr* court set us on some 33 years ago—a course that has culminated in hypertechnical application—and acknowledge things have gone too far.[6] An overly strict application of the rule has evolved. The *Zehr* court had a good idea, but that idea need not have been implemented in a compulsory manner nor according to rigid requirements.[7]

---

[6]It is worth reiterating that the issue in *Zehr* was whether the trial court erred in refusing to ask the pertinent questions *when requested by defense counsel* and that the 1997, on-demand version of Rule 431(b)—in effect for 10 years—required compliance *only* upon defense counsel's request. There has been an evolution here beyond the specific holding of *Zehr*. Under the court's current reasoning, does the failure to ask the "essential" *Zehr* questions, and to receive appropriate responses, in a closely balanced evidence case have retroactive implications, as the "potentiality" is that any such defendant might have been tried by biased jurors, a violation of the defendant's constitutional rights?

[7]Are jurors who solemnly pledge, at the outset, to truthfully answer questions posed to them and, ultimately, to apply the law and principles given them, "presumptively" or "potentially" incapable of rendering a fair and impartial verdict, based solely on admissible evidence and applicable legal principles, because they have not spoken the specific words "accept" and "understand" with respect to the *Zehr* principles? The majority's answer would seem to be yes. The juror's oath has been described as "a solemn vow to serve the rule of law which governs the social contract of our society. The juror's oath is essentially a promise to lay aside one's 'impression or opinion and render a verdict based on the evidence presented in court.' " *People v. Abadia*, 328 Ill. App. 3d 669, 676 (2001) (quoting *People v. Williams*, 40 Ill. 2d 522, 531-32 (1968)). Section 14 of the Jury Act (705 ILCS 305/14 (West 2014)), though addressing the circumstance in which a juror has formed a pretrial "opinion or impression, based upon rumor or upon newspaper statements," provides that opinion or impression "shall not disqualify him to serve as a juror in such case, if he shall upon oath state that he believes he can fairly and impartially render a verdict therein, in accordance with the law and the evidence, and the court shall be satisfied with the truth of such statement." *That* is the essential qualification for jury service—a juror

Its application in this case has not furthered the ends of justice. The violation/variance in this case does not warrant reversal.

¶ 97   JUSTICE BURKE, dissenting:

¶ 98   At issue in this case is whether a violation of Illinois Supreme Court Rule 431(b) can be plain error under the closely balanced evidence prong of the plain error doctrine. In addressing this question the majority holds that the *voir dire* questions set forth in Rule 431(b) "constitute preliminary instructions to potential jurors on how they must evaluate the evidence" (*supra* ¶ 67), and the trial court's failure to properly ask the questions in this case was "instructional error" (*supra* ¶ 66) that requires reversal of defendant's conviction. Surprisingly, however, in reaching this conclusion the majority never takes into account the fact that the jurors were also instructed on the Rule 431(b) principles at the close of trial, when they were given Illinois Pattern Jury Instruction No. 2.03 (Illinois Pattern Jury Instructions, Criminal, No. 2.03 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 2.03)). In so doing, the majority opinion takes a position that is directly at odds with this court's decisions in *People v. Glasper*, 234 Ill. 2d 173 (2009), and *People v. Thompson*, 238 Ill. 2d 598 (2010), both of which hold that we must presume that the jury follows IPI Criminal 4th No. 2.03, even when the trial court has violated Rule 431(b). For this reason, I respectfully dissent.

¶ 99                                            I

¶ 100   Illinois Supreme Court Rule 431 governs the conduct of *voir dire* in criminal proceedings. At the time of trial in this case, subsection (b) of Rule 431 provided:

"The court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 101   As noted, the majority holds that the questions required by Rule 431(b) "constitute preliminary instructions to potential jurors on how they must evaluate the evidence" (*supra* ¶ 67) and, therefore, a failure to substantially comply with the rule is "an instructional error" (*supra* ¶ 66). Jurors, however, are also given instructions at the end of trial, before they begin their deliberations. Through instructions given at the close of trial, it is possible to admonish and instruct the jurors on the same principles addressed in Rule 431(b) before any verdict has been reached.

¶ 102   For example, IPI Criminal 4th No. 2.03, which indisputably was given in this case, mirrors the language of Rule 431(b). The pattern instruction states:

who pledges to "fairly and impartially render a verdict *** in accordance with the law and the evidence." If a juror promises to do that, he or she has agreed to do all that the law requires—all that a defendant on trial can ask. That comprehensive promise covers the myriad circumstances that may arise at trial, emphasizing none at the expense of others.

"The defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

¶ 103    Similarly, IPI Criminal 4th No. 2.04, which is relevant only when the defendant chooses not to testify, mirrors Rule 431(b)(4).[8] It states:

"The fact that the defendant did not testify must not be considered by you in any way in arriving at your verdict."

¶ 104    When determining whether a criminal conviction must be reversed because of an instructional error, we ordinarily must consider *all* the instructions given to the jury, in their entirety. See, *e.g.*, *People v. Terry*, 99 Ill. 2d 508, 516 (1984) ("Instructions in criminal cases must be read as a whole."). Accordingly, any analysis of whether a Rule 431(b) "instructional error" requires reversal of a defendant's conviction must begin first with asking what effect an instruction given at the close of trial has on that error.

¶ 105    This court's approach to that question has changed over time. In *People v. Zehr*, 103 Ill. 2d 472 (1984), the defendant asked the trial court to examine potential jurors during *voir dire* in accord with the questions now found in Rule 431(b). The trial court refused, and the defendant was convicted.

¶ 106    On appeal, this court did not characterize the questions requested by the defendant as simply preliminary jury instructions. Rather, this court held that the questions were "essential to the qualification of jurors in a criminal case" and "vital to the selection of a fair and impartial jury." *Id.* at 477. The court concluded that each of the defendant's questions went " 'to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' " and, therefore, although the questions "need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on *voir dire*." *Id.*

¶ 107    Illinois Pattern Jury Instruction No. 2.03 (Illinois Pattern Jury Instructions, Criminal, No. 2.03 (2d ed. 1981) (hereinafter, IPI Criminal 2d No. 2.03)) was given to the jury in *Zehr*, but this court concluded that if a juror harbors a prejudice against any of the "basic guarantees" addressed in the questions, "an instruction given at the end of the trial will have little curative effect." *Id.* In other words, because the questions were meant to ferret out juror bias so that the juror could be dismissed for cause, an instruction to the biased juror at the end of trial would not eliminate the prejudice to the defendant. Further, because a biased juror is one that, by definition, does not follow the law, the ordinary presumption that jurors follow the instructions given to them would not apply. For these reasons, *Zehr* held that the trial court's refusal to ask the defendant's questions was, by itself, "prejudicial error which required reversal" (*id.* at 477-78), even if the jury was also given IPI Criminal 2d No. 2.03.

¶ 108    Several years later, in *People v. Glasper*, 234 Ill. 2d 173 (2009), this court altered its approach to Rule 431(b) error. In that case, the defendant asked the trial court to question

---

[8]Because defendant testified at trial, IPI Criminal 4th No. 2.04 was not given in this case.

prospective jurors during *voir dire* on whether they understood and accepted that the defendant's failure to testify could not be held against him. The court refused. The defendant did not testify and was convicted.

¶ 109      On appeal in this court, the defendant contended that the trial court's refusal to ask his question was a violation of Rule 431(b)(4) and this violation amounted to *per se* or structural error requiring automatic reversal of his conviction.

¶ 110      This court agreed with the defendant that the trial judge had violated Rule 431(b)(4) by refusing to ask the requested question but rejected the defendant's contention that the violation amounted to structural error. The court acknowledged that there was language in *Zehr* that could "be construed to suggest that automatic reversal [was] required." *Glasper*, 234 Ill. 2d at 197. However, the court stated that since the time *Zehr* had been decided, this court had "moved away" from *Zehr*'s holding "that the relevant questions should be covered 'in the course of interrogation on *voir dire*,' and that the failure to ask these questions amount[ed] to 'prejudicial error.' " *Id.* (quoting *Zehr*, 103 Ill. 2d at 477-78). The *Glasper* court rejected the contention that a trial court's failure to ask a Rule 431(b) question denies a defendant the right to a fair and impartial jury that requires automatic reversal. Instead, the *Glasper* court stated:

> "If the facts in this case demonstrated that the trial court's failure to question the venire in accordance with Rule 431(b)(4) resulted in defendant being tried before a biased jury, we would not hesitate to reverse defendant's conviction, as a trial before a biased jury would constitute structural error. However, there are no such facts in the instant case. We reject the idea that the trial court's failure to conduct Rule 431(b)(4) questioning makes it inevitable that the jury was biased, particularly when the record before us demonstrates that the jurors in this case were both admonished and instructed against forming an adverse inference against defendant based on his decision not to testify. To do so would require us to presume that citizens sworn as jurors ignore the law and the jury instructions given to them. This notion is contrary to our precedent, which instructs us to make the opposite presumption. See *People v. Taylor*, 166 Ill.2d 414, 438 (1995) ('The jury is presumed to follow the instructions that the court gives it')." *Id.* at 200-01.

¶ 111      *Glasper* thus held that when the jury is properly instructed at the close of trial on the principles found in Rule 431(b), we must presume the jury followed the instruction, even if there was a violation of Rule 431(b) during *voir dire*. In the words of *Glasper*, there are "no facts" from which a reviewing court may find that the jury did not understand and accept the Rule 431(b) principles and no prejudice to the defendant as a result of a Rule 431(b) violation if the jury is properly instructed at the close of trial. And, because there is no prejudice to the defendant, the Rule 431(b) violation cannot be structural error. To conclude otherwise, *Glasper* said, would be contrary to our precedent, which holds that jurors are presumed to follow the instructions that are given to them.

¶ 112      The approach to Rule 431(b) error that was established in *Glasper* was reaffirmed a little over a year later in *People v. Thompson*, 238 Ill. 2d 598 (2010). In that case, the trial judge failed to ask prospective jurors during *voir dire* if they "understood and accepted" that the defendant was not required to produce any evidence on his own behalf and if they understood the presumption of innocence. *Id.* at 607. The defendant did not testify and was convicted. Before this court, the defendant argued that the trial judge had violated Rule 431(b) and that the

violation amounted to plain error under the fundamental fairness prong of the plain error doctrine.

¶ 113   This court agreed that Rule 431(b) had been violated but disagreed with the assertion that the violation was plain error. In reaching this result, the *Thompson* court repeated, verbatim, the text from *Glasper* quoted above. *Id.* at 610. The court further noted that the jury had been given both IPI Criminal 4th Nos. 2.03 and 2.04 and, therefore, had been properly instructed on the Rule 431(b) principles. *Id.* at 604, 615. The *Thompson* court concluded:

> "In this case, the prospective jurors received some, but not all, of the required Rule 431(b) questioning. The venire was also admonished and instructed on Rule 431(b) principles. Defendant has not established that the trial court's violation of Rule 431(b) resulted in a biased jury. Defendant has, therefore, failed to meet his burden of showing the error affected the fairness of his trial and challenged the integrity of the judicial process. Accordingly, the second prong of plain-error review does not provide a basis for excusing defendant's procedural default." *Id.* at 615.

¶ 114   As in *Glasper*, the *Thompson* court held that we must presume the jury followed the instructions given at the close of trial, even though there was a Rule 431(b) violation during *voir dire*. This meant there was no "evidence that the jury was biased" (*id.* at 614) and, thus, the defendant's trial was not fundamentally unfair.

¶ 115   I dissented in both *Thompson* and *Glasper*. See *Thompson*, 238 Ill. 2d at 616 (Burke, J., dissenting, joined by Freeman, J.); *Glasper*, 234 Ill. 2d at 216 (Burke J., dissenting, joined by Freeman, J.). My complaint in both cases was that this court had overruled *Zehr* without acknowledgement or justification under principles of *stare decisis*. I noted, in particular, that the court's holding that we must presume that the jury follows an instruction such as IPI Criminal 4th No. 2.03 after a Rule 431(b) violation has been committed marked "a complete reversal of our holding in *Zehr*" that the failure to ask the Rule 431(b) questions prevented a defendant from making informed challenges for cause and, therefore, the error, in itself, deprived a defendant of his right to a fair and impartial jury. *Glasper*, 234 Ill. 2d at 228 (Burke, J., dissenting, joined by Freeman, J.).

¶ 116   However, after dissenting twice to point out that the court was departing from the approach to Rule 431(b) error taken in *Zehr*, I subsequently acknowledged that *Thompson* and *Glasper* were the law and I was bound to follow them. *People v. Belknap*, 2014 IL 117094, ¶ 91 (Burke, J., specially concurring, joined by Freeman, J.). Accordingly, prior to today, this court has unanimously held that, even in those cases where the trial court has violated Rule 431(b), we must presume that the jury will follow IPI Criminal 4th No. 2.03 and, as a consequence, the defendant has suffered no prejudice. Notably, this holding has been uniformly followed by our appellate court. See, *e.g.*, *People v. Williams*, 409 Ill. App. 3d 408, 414 (2011) ("as in *Thompson*, all of the Rule 431(b) principles were accurately conveyed to the jury through the jury instructions, and there is nothing to suggest that the jury in this case was biased. Accordingly, *Thompson*'s holding controls."); *People v. Sevier*, 2012 IL App (1st) 101840-U, ¶ 49 (same); *People v. Sanchez*, 2013 IL App (2d) 110842-U, ¶ 45 (same, citing *Glasper*); *People v. Hampton*, 2012 IL App (2d) 100856-U, ¶ 12 (citing *Glasper*).

¶ 117                                          II

¶ 118        In the case now before us, the trial court explained the relevant principles listed in Rule 431(b) to the venire but, instead of asking each potential juror whether he or she "understood and accepted" the principles, the court asked the jurors whether they had "any problems" with them or whether they "believed" in them. Defendant contends, and the majority agrees, that this constituted a violation of Rule 431(b).[9]

¶ 119        Defendant never raised any objection regarding Rule 431(b) at the time of trial. However, he now argues before this court that the evidence in this case was closely balanced and, therefore, the trial court's Rule 431(b) violation amounts to plain error under the closely balanced evidence prong of the plain error doctrine.

¶ 120        If we apply the law as it currently stands, *i.e.*, the law set forth in *Thompson* and *Glasper*, defendant's argument necessarily fails. At the close of trial, the trial court gave the jury IPI Criminal 4th No. 2.03, the same instruction that was given to the jury in *Thompson*. Under *Thompson* and *Glasper*, we must presume that the jury followed the instruction, even if Rule 431(b) was violated during *voir dire*. This means, therefore, that the jury considered the evidence before it with the understanding that the defendant was presumed innocent and that the State had the burden of proof beyond a reasonable doubt. Accordingly, defendant could not possibly have suffered prejudice from any Rule 431(b) violation committed by the trial court. This is true regardless of the nature and weight of the evidence introduced at trial. Thus, defendant has failed to establish plain error. See, *e.g.*, *People v. Hopp*, 209 Ill. 2d 1, 12 (2004) (the plain error rule requires the defendant to "show that the error caused a *severe* threat to the fairness of [the] trial" (emphasis in original)).

¶ 121        Despite the foregoing, the majority holds that defendant's conviction must be reversed. In reaching this result, however, the majority fails to account for the fact that the jury was given IPI Criminal 4th No. 2.03 and that we must presume the jury followed that instruction. *Supra* ¶¶ 1-72. There are two possible explanations for the majority's position.

¶ 122        First, the majority concludes that in this case, unlike *Thompson* and *Glasper*, the evidence against the defendant was closely balanced. This fact, according to the majority, is dispositive. *Supra* ¶ 72 ("we hold that the defendant is entitled to relief from a clear Rule 431(b) error because he has demonstrated that the evidence was closely balanced"). The majority may therefore have decided that, *because* the evidence in this case was closely balanced, the presumption that jurors follow the instructions given to them is negated.

¶ 123        If this is what the majority believes, it is obviously incorrect. *Thompson* and *Glasper* hold that a defendant suffers no prejudice from a Rule 431(b) violation when the jury is also given IPI Criminal 4th No. 2.03 at the close of trial because we must presume the jury follows the instruction. The fact that the evidence is closely balanced does not change this. Closely balanced evidence cannot, in some manner, transform a jury from one that follows instructions into one that does not. Closely balanced evidence does not create error. If it was otherwise,

_____

[9]Chief Justice Karmeier concludes that reversal is not warranted in this case even though the trial judge did not use the precise language of Rule 431(b) because the principles of the rule were adequately addressed during *voir dire*. *Supra* ¶ 94 (Karmeier, C.J., dissenting). I agree with this conclusion. Substantial compliance with the rule is all that is required, and that standard was met here. See *Zehr*, 103 Ill. 2d at 477 (holding that "the subject matter of the questions" must be covered on *voir dire* but that no precise form of questioning is necessary).

then in every case in which the evidence is closely balanced, we would have to presume that the jurors do not follow the instructions they are given. Clearly, no decision has ever held this.

¶ 124   The majority cites *People v. Herron*, 215 Ill. 2d 167 (2005), and *People v. Piatkowski*, 225 Ill. 2d 551 (2007), two cases that set out the general rules governing allegations of plain error under the closely balanced evidence prong. Not surprisingly, neither of these cases holds that the presumption that the jury follows the instructions it has been given is, in some unexplained way, undone or annulled when the evidence is closely balanced.

¶ 125   The majority also cites *People v. Belknap*, 2014 IL 117094, and *People v. Wilmington*, 2013 IL 112938. Both of those cases held only that the evidence against the defendants was overwhelming and, thus, plain error review was "unwarranted" (*Belknap*, 2014 IL 117094, ¶ 70). Neither case discussed whether the presumption that a jury follows an instruction such as IPI Criminal 4th No. 2.03 is affected by the closeness of the evidence.

¶ 126   In sum, if the majority means to say that IPI Criminal 4th No. 2.03 may be disregarded in this case because the evidence is closely balanced, then this is a serious logical fallacy.

¶ 127   The second possible explanation for the majority's disregard of IPI Criminal 4th No. 2.03 is equally troubling. Recall, again, that *Zehr* held that the failure to ask potential jurors the Rule 431(b) questions was, in itself, a deprivation of the defendant's right to an impartial jury and, for this reason, "an instruction given at the end of the trial will have little curative effect" (*Zehr*, 103 Ill. 2d at 477). In contrast, both *Thompson* and *Glasper* hold that we must presume the jury follows an instruction given at the close of trial such as IPI Criminal 4th No. 2.03, even if there was a violation of Rule 431(b) during *voir dire*. *Thompson*, 238 Ill. 2d at 610-11; *Glasper*, 234 Ill. 2d at 200-01. The majority now states:

> "The comments in *Glasper* and *Thompson* that the dissent finds so compelling do not discuss or even cite *Zehr*, so we refuse to find in them a *sub silentio* abrogation of our statement in that case about the negligible effect of instructions at the close of trial." *Supra* ¶ 77.

¶ 128   This is a remarkable statement. The "comments" in *Thompson* and *Glasper* that the majority refers to are the explicit and unequivocal holdings in those cases that when a jury is given an instruction such as IPI Criminal 4th No. 2.03 we must presume that the jury follows it. The majority now apparently believes that *Thompson* and *Glasper* do not say that. By necessity, then, the majority is holding that when Rule 431(b) has been violated, *we cannot presume that the jury will follow IPI Criminal 4th No. 2.03*.

¶ 129   Consider for a moment what this means. A jury that does not follow the instructions that it has been given is a biased jury. Trial before a biased jury is structural error. *Glasper*, 234 Ill. 2d at 201. The majority, by eliminating the presumption that the jury follows IPI Criminal 4th No. 2.03 after a Rule 431(b) violation, has necessarily concluded that a Rule 431(b) error is structural error. While this result is consistent with *Zehr*, it is the complete opposite of this court's holdings in *Thompson* and *Glasper*.

¶ 130   And there is more. The principles set forth in Rule 431(b) and IPI Criminal 4th No. 2.03 are critical concepts in the criminal law. As our pattern jury instruction committee has stated, "The firm commitment to presumed innocence which can be overcome only by proof beyond a reasonable doubt is the touchstone of American criminal jurisprudence." IPI Criminal 4th No. 2.03, Committee Note. Now, however, according to the majority, the jury in this case was not properly instructed on these fundamental principles during *voir dire* because the trial court

violated Rule 431(b). Moreover, according to the majority, giving IPI Criminal 4th No. 2.03 to the jury had no effect on them whatsoever. It necessarily follows then, based on the majority's reasoning, that the jury in this case was *never* properly instructed on the most critical legal principles in a criminal case, principles that form the "touchstone of American criminal jurisprudence." Logically, if we apply the majority's reasoning, the Rule 431(b) error "affected the fairness of [defendant's] trial and challenged the integrity of the judicial process." *Thompson*, 238 Ill. 2d at 615.

¶ 131    What the majority does not seem to realize is that, by eliminating the presumption that the jury follows IPI Criminal 4th No. 2.03 even after a Rule 431(b) violation, they have necessarily concluded that a Rule 431(b) violation constitutes prong two plain error. Again, this result may be consistent with *Zehr*, but it is the complete opposite of this court's holding in *Thompson*.

¶ 132    The majority claims that it is not disturbing *Thompson* and *Glasper* and it is still the law that a Rule 431(b) violation is neither structural error nor prong two plain error. But this cannot possibly be. You cannot knock the legs out from under a table and expect that the table will continue to float in mid-air. The presumption that a jury follows the instructions which it has been given was critical to *Thompson* and *Glasper*—it was the "legs" that supported the judgments in those cases.

¶ 133    Because the majority has concluded that defendant was prejudiced by the trial court's violation of Rule 431(b), despite the presumption that the jury will follow IPI Criminal 4th No. 2.03, it is rejecting settled law. This is done with no acknowledgement of the principles of *stare decisis* and no attempt by the majority to justify its actions under that doctrine.

¶ 134                                    III

¶ 135    I recognize the irony inherent in this dissent. I am writing in support of *Thompson* and *Glasper*, two opinions with which I disagreed when they were decided. However, I have acknowledged that these decisions are the law. Were I to join the majority here I would be guilty of the same conduct for which I criticized the court in *Thompson* and *Glasper*, that is, failing to recognize and respect controlling precedent under principles of *stare decisis*. I will not do that and, therefore, must respectfully dissent.

¶ 136    JUSTICE FREEMAN joins in this dissent.