2020 IL App (1st) 170246-U

Nos. 1-17-0246 and 1-17-0247 (cons.)

SIXTH DIVISION
FEBRUARY 21, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 15 CR 15503 |
| | ) | 15 CR 15504 |
| TERRY BUCHANAN, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Mary Margaret Brosnahan, |
| | ) | Judge Presiding. |

JUSTICE CUNNINGHAM delivered the judgment of the court.
Presiding Justice Mikva and Justice Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for residential burglary are affirmed where the trial court did not err in sustaining an objection to a statement in defense counsel's closing argument.

¶ 2    Following a jury trial on two consolidated cases, the defendant-appellant Terry Buchanan was convicted of residential burglary (720 ILCS 5/19-3(a) (West 2014)) and sentenced to 18 years' imprisonment in each case, to be served concurrently. On appeal, the defendant argues that the

trial court erred in sustaining the State's objection to a statement his defense counsel made in closing argument. For the following reasons, we affirm the judgment of the circuit court of Cook County.

¶ 3                                        BACKGROUND

¶ 4      The defendant was charged with one count of residential burglary in each of two consolidated cases, case nos. 15 CR 15503 and 15 CR 15504. In case no. 15 CR 15503, the State charged that, on or about September 7, 2015, the defendant, knowingly and without authority, entered the dwelling place of Akshaya Polaepalli with the intent to commit therein a theft. In case no. 15 CR 15504, the State charged that, on September 6 to September 7, 2015, the defendant, knowingly and without authority, entered the dwelling place of Gina Russell and Carly Carano with the intent to commit therein a theft.

¶ 5      At trial, the evidence showed that on September 6, 2015, Akshaya Polaepalli was living in an apartment with three roommates on South Oakley Boulevard in Chicago. That night, Polaepelli went to sleep at approximately midnight, after closing the wooden pocket door of her bedroom. The doors leading into the apartment were all locked. She generally slept until 8:00 or 9:00 a.m., but woke up at approximately 5:30-6:00 a.m. the next morning. Polaepalli saw her bedroom door was half-opened and her first instinct upon waking was "that there was someone inside the room." She then discovered her cell phone and wallet were not on her nightstand where she had left them when she went to sleep. Polaepalli woke her roommate Rashmi Holla, who slept in another room. Holla checked the doors and windows, discovering the back door and windows were locked but the front door had only one lock engaged. The roommates normally locked it using three separate locks.

¶ 6    Polaepalli and Holla used Holla's cell phone to dial Polaepalli's cell phone number, putting the phone on speaker. When a man answered, Polaepalli asked him how he got her phone. The man said he got it "from someone on an El train that night * * * around midnight or before midnight" for $40. After this conversation, Polaepalli and Holla called 911, and the police came to the apartment approximately 30 to 40 minutes later. Before the police arrived, Polaepalli and Holla placed a second call to Polaepalli's phone number to ask the man to return the phone. The man told them he was driving from north of Chicago in his sister's car and would return the phone in exchange for the $40 he paid for it. Polaepalli and Holla agreed to meet him at "Taylor and Ashland at the intersection," because Polaepalli did not want to give him her address.

¶ 7    Chicago police officer Theodore Floodas subsequently arrived at the apartment and checked the doors and windows for signs of breaking and entering. Officer Floodas discovered that the windows and doors were closed and locked and showed no signs of forced entry. Officer Floodas asked questions about what happened, and Polaepalli and Holla told him about their conversations with the man who had Polaepalli's phone. Officer Floodas asked Polaepalli to call the man again in order to set up a meeting to retrieve the phone and told her to get a description of him. The man said, again on speaker phone, that he would be wearing a white t-shirt and black pants.

¶ 8    After this conversation, Officer Floodas drove Polaepalli and Holla to the meeting location, near Taylor Street and Ashland Avenue, dropping them off a block away. Officer Floodas then contacted other officers to set up surveillance of the meeting location. Polaepalli and Holla walked to the intersection where they saw a man walking toward them wearing a white shirt and black pants. Polaepalli identified the defendant in court as that man. The defendant handed a cell phone

to Polaepalli and, "[l]ess than 30 seconds later," several police officers, including Officer Floodas, arrived at the intersection and arrested the defendant. Polaepalli verified the phone was hers. After the defendant was arrested, Officer Floodas drove Polaepalli and Holla to the police station, where they gave their statements.

¶ 9    Polaepalli had never seen the defendant prior to the meeting on September 7, and never gave him permission to enter her apartment or take her property.

¶ 10    Chicago police officers Ruben Ramirez and Mantino Ortiz were present at the surveillance operation organized by Officer Floodas. After Officer Ortiz placed the defendant into custody, Officer Ramirez performed a custodial search of his person and found "a cell phone, a wallet, keys, and a bag of tobacco," which were inventoried at the police station. Chicago police officer Ruben Romero discovered that the vehicle key recovered during the search unlocked a Chrysler PT Cruiser in the area of Taylor Street and Ashland Avenue. He drove the vehicle to the police station, where Officers Ramirez and Romero searched it. They found a guitar case and a backpack containing two Apple MacBook laptops in the "back compartment area." Officer Ramirez powered up the laptops and saw names on the tool bars of each computer: Gina Russell and Carly Carano. The officers did not recover any crowbars, screwdrivers, or any other "lock picking tools" from the vehicle. During the course of the investigation, Officer Ramirez discovered that the defendant lived approximately at Roosevelt Road and Western Avenue in Chicago, less than a mile from Taylor Street and Ashland Avenue.

¶ 11    Gina Russell and Carly Carano were roommates in September 2015, living in an apartment building on South Loomis Street in Chicago. On September 6, 2015, Russell and Carano left the apartment at 11:00 p.m. for a few hours, returning after midnight. When they returned to the

apartment, they both discovered their laptops were missing. Carano was also missing $65 cash which was in an envelope on her desk. There were no signs of forced entry into the apartment. Russell and Carano called the police, who came to their apartment and filed a report.

¶ 12    On September 7, 2015, at approximately 9:00 a.m., Russell received a telephone call from a police officer saying that they had found property that seemed to belong to her. Russell arrived at the police station and met with Detective Steve Grzenia, who showed her a laptop. She identified it as hers. When Carano arrived, she identified her laptop and money, as well as her guitar which she had not realized was also missing. Carano and Russell had never seen the defendant before nor given him permission to be inside their apartment on the date of the incident.

¶ 13    Detective Grzenia interviewed the defendant twice. He first interviewed the defendant after speaking with Polaepalli and Holla and learning the facts of the case. Detective Grzenia advised the defendant of his rights, and the defendant indicated that he understood his rights and agreed to speak with him. The defendant stated that the previous night "he had been up on the north side in the area of Belmont and the red line at approximately midnight, [and] he purchased the phone in question from an unknown subject for $40." The defendant also told Detective Grzenia that he was contacted by Polaepalli at approximately 5:00 a.m. and agreed to meet her to exchange the phone for $40. Detective Grzenia never questioned the defendant regarding residential burglary or the property taken from the Oakley or Loomis addresses during this conversation.

¶ 14    After this initial conversation, Detective Grzenia learned that the arresting officers discovered property in the back of the defendant's vehicle "that had different people's names on [it]." Detective Grzenia ran a search in the police department records for the names on the property

and discovered that a burglary had been reported at 2:00 a.m. that day. He spoke with either Russell or Carano over the phone and asked them to come into the station.

¶ 15    Detective Grzenia then interviewed the defendant again because Polaepalli's statement that her phone was in her possession until at least 12:30 a.m. was inconsistent with the defendant's statement that he bought the phone at midnight, and because the defendant was now in possession of property from a second burglary.

¶ 16    Detective Grzenia told the defendant there were inconsistencies in his story and that police now had property recovered from his vehicle. The defendant told Detective Grzenia "that his initial story about being up north was all BS and made up," and then informed Detective Grzenia "of what the truth of the matter really was." The defendant stated that he had met an acquaintance of his, Poco, at approximately 12:00 to 12:20 a.m. in the area of Taylor and Western.[1] The defendant described Poco as "a hype and a thief, and that [the defendant] would sell stolen property for Poco in exchange, they would split the proceeds from whatever they got."

¶ 17    The defendant stated that, on that night he drove Poco to the area of Oakley and Taylor where Poco went into a house for "a few minutes" while the defendant was acting as a look out in order to "alarm" Poco if anything happened. Poco returned with a cell phone and told the defendant to sell it so they could "split the proceeds." The defendant and Poco then "drove around for a little while" "drinking [and] getting high." Poco told the defendant to take him to an area around Loomis and Polk, where Poco again exited the vehicle while the defendant acted as a lookout. When Poco returned 5 to 10 minutes later, he had a bag containing "a couple of laptop computers and a guitar."

---

[1] During his testimony, the defendant refers to this person as "Poco." However, during closing argument, the transcript spells this individual's name as "Paco" and in further transcripts his name is spelled "Pocko." We will refer to this person as "Poco" for the sake of clarity and consistency.

¶ 18    The defendant gave Detective Grzenia a "very general description" of Poco and was not sure Poco was an actual name. Detective Grzenia tried to locate Poco but was unable to find further information about him, including whether Poco was his real name. The defendant did not give Detective Grzenia an address for Poco, only a general location. Detective Grzenia or a "mission team" went to the area but could not find Poco. At no time during the interviews did Detective Grzenia tell the defendant that he was investigating residential burglaries or specifically burglaries on Loomis Street and Oakley Boulevard before the defendant mentioned Poco going into residences on those streets.

¶ 19    Detective Grzenia testified that the Oakley and Taylor location where the defendant first drove Poco was approximately "three or four doors down" from the Oakley address of the first burglary. The Polk and Loomis location was "approximately half a block" from the Loomis address of the second burglary. The Loomis burglary occurred "a little bit over a mile" from the Oakley burglary.

¶ 20    Detective Grzenia thought he interviewed the defendant in an interview room with video and audio recording devices but was not certain. He did not record the two interviews. Nor did Detective Grzenia prepare a statement for the defendant to review and sign. He met with Russell and Carano after the second interview with the defendant.

¶ 21    The State rested. The court denied the defendant's motion for a directed finding, and the defendant rested without presenting evidence.

¶ 22    In closing, the State argued that the defendant was accountable for Poco's breaking into the apartments and taking the property where the defendant acted as "a lookout, a get out, and a seller." The defendant argued that the State failed to meet its burden to prove the defendant was

involved in the burglaries as either the individual who entered the dwellings or as the lookout. With respect to the second point, the defendant argued extensively that Detective Grzenia's testimony that the defendant confessed to acting as lookout for Poco was not credible. The defendant argued his actions in "return[ing]" the phone belie the inference that he was involved in its taking and were consistent with his first statement to Detective Grzenia that he purchased the phone from someone on the train. The defendant argued that the jury could not give weight to Detective Grzenia's testimony because he "forgot" to record the defendant's statements not once but twice, did not "recall" whether he used an interview room with video capability for the interviews, and never prepared a statement for the defendant's signature.

¶ 23    The following exchange then took place:

[DEFENSE COUNSEL]: Detective Grysnia [*sic*] sees [the defendant] sees the evidence before him has spoken to the arresting officers. Knows there's not enough to implicate [the defendant] as actually entering the residence.

[STATE]: Objection.

[TRIAL COURT]: Sustained.

The defendant then questioned why Detective Grzenia did not investigate who owned the vehicle where the laptops and guitar were found. He asserted that Detective Grzenia did not "go out there" to look for Poco, and Detective Grzenia's work on the case was "sloppy," stating Detective Grzenia "had his man. Next case." The defendant argued he was guilty only of possession of stolen goods or, if he knew the goods were stolen, theft. Before the parties made their closing arguments, the court instructed the jury that closing arguments, like opening statements, were not evidence, and if counsel for either side misspoke or misrepresented evidence, the jury should disregard it.

¶ 24 The jury found the defendant guilty of both counts of residential burglary. The trial court denied the defendant's motion for a new trial, sentenced him to two concurrent terms of 18 years' imprisonment, and denied the defendant's motion to reconsider sentence. This appeal followed.

¶ 25                                ANALYSIS

¶ 26 We note that we have jurisdiction to review the trial court's judgment as the defendant filed a timely notice of appeal. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 27 On appeal, the defendant argues that this court should reverse his convictions and remand for a new trial because the trial court improperly sustained the State's objection to his argument that Detective Grzenia knew "there's not enough to implicate [the defendant] as actually entering the residence" at the time of the defendant's confession. He argues that the court instructed the jury to disregard a reasonable defense argument, which he characterizes as: Detective Grzenia "had a potential motive to falsely [claim] that [the defendant] had confessed to his involvement" in the two burglaries where Detective Grzenia suspected the defendant's possession of recently stolen goods would not, standing alone, be sufficient to prove his involvement.[2] The defendant asserts this argument was "essential" to his case and, by incorrectly sustaining the objection, "the court essentially left the jury with no choice but to credit [Detective] Grzenia's testimony and find [the defendant] guilty of burglary, and it cannot be determined that the jury would have convicted [the defendant] if it had been permitted to consider defense counsel's argument."

¶ 28 As an initial matter, the defendant admits that, because this argument was not raised in the motion for a new trial, it is technically forfeited. *See People v. Sebby*, 2017 IL 119445, ¶ 48

---

[2] The defendant points out that the trial court had instructed the jury to "disregard questions and exhibits *** to which objections were sustained."

(holding that to preserve claims for appeal, a defendant must make both a contemporaneous objection and raise the issue in a posttrial motion). Nevertheless, the defendant urges us to review it under the first prong of the plain error doctrine.

¶ 29　The first prong of the plain error doctrine allows a reviewing court to consider an unpreserved error if a clear and obvious error occurred and the evidence is so closely balanced that the error threatened to tip the scales of justice against the defendant. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Plain error under the first prong requires "a finding that the evidence is so closely balanced that the guilty verdict may have resulted from the error." *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). The burden of persuasion in plain error review rests with the defendant. *Id*. The first step of this analysis is determining whether any error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 30　The United States Constitution guarantees criminal defendants the right to make a closing argument before a factfinder at trial. *People v. Millsap*, 189 Ill. 2d 155, 166 (2000) (citing *Herring v. New York*, 422 U.S. 853, 860 (1975)). Counsel is afforded wide latitude in closing arguments, and "[a]rgument and statements that are based upon the facts in evidence, or upon reasonable inferences drawn therefrom, are within the scope of proper closing argument." *People v. Crawford*, 343 Ill. App. 3d 1050, 1058 (2003). A closing argument not based upon the evidence lacks a proper foundation and is improper. *People v. Terry*, 312 Ill. App. 3d 984, 993 (2000). "The regulation of the substance and style of closing argument lies within the trial court's discretion; the court's determination of the propriety of remarks will not be disturbed absent a clear abuse of discretion." *People v. Caffey*, 205 Ill. 2d 52, 128 (2001).

¶ 31    In this case, we do not find that the trial court abused its discretion in sustaining the State's objection to the defendant's argument that Detective Grzenia knew, after seeing the evidence and speaking to the arresting officers, that there was not enough evidence "to implicate [the defendant] as actually entering the residence," and the resulting inference that Detective Grzenia fabricated the defendant's second statement to him because he did not have enough evidence connecting the defendant to the burglaries. This argument was not based upon facts in evidence and is not a reasonable inference from those facts. Detective Grzenia's testimony contains no reference to or impeachment regarding either his possible motivation to fabricate a confession or knowledge regarding the quantity of evidence implicating the defendant in the two burglaries. In fact, when Detective Grzenia conducted the second interview, he had not yet interviewed the victims of the second robbery. All he knew was that proceeds from the second burglary were found in the defendant's vehicle and that the victims of that burglary were on their way to the police station. Accordingly, as the argument was not supported by the evidence, we find the court did not abuse its discretion in sustaining the State's objection to the defendant's argument. Because we find no error in the trial court's actions, there can be no plain error and we therefore affirm the defendant's convictions. See *Walker*, 232 Ill. 2d at 124 ("[t]he initial step in conducting plain-error analysis is to determine whether error occurred at all.").

¶ 32    Further, even if the trial court erred in sustaining the State's objection, the error does not rise to the level of plain error under the first prong of plain error as the defendant contends.[3] The defendant contends but for the trial court's error in sustaining the State's objection, the jury had

_____

[3] As the defendant argues only first-prong analysis applies, we will not analyze this issue under the second prong of the plain error doctrine. See, *e.g.*, *People v. Jung*, 192 Ill. 2d 1, 21 (2000) ("points not argued in the appellant's brief are waived").

"no choice" but to credit Detective Grzenia's testimony given the trial court's instruction to ignore questions to which objections were sustained, and thereby no choice but to find the defendant guilty of burglary. We disagree. The inference in the challenged argument was that Detective Grzenia had a motive to invent a false "accountability" confession since he knew there was insufficient evidence to show the defendant entered the residences. However, this was but one of the defendant's attacks on Detective Grzenia's credibility. The crux of the defendant's closing argument was Detective Grzenia's lack of credibility regarding the defendant's confession. To that end, the defendant argued extensively regarding Detective Grzenia's failure to record the interviews, failure to record a written confession, inability to recall where the interviews took place, failure to investigate Poco, and overall lack of diligence and "sloppy" work in investigating the case because he "had his man." The jury heard the defendant argue in many different ways that Detective Grzenia, the only source of the defendant's confession, was incredible. Therefore, its inability to consider whether Detective Grzenia additionally had a motive to fabricate the confession is unlikely to have tipped the scales of justice against the defendant.

¶ 33    The defendant must show prejudice to obtain relief under the first prong of the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 68. "What makes an error prejudicial is the fact that it occurred in a close case where its impact on the result was potentially dispositive." *Id*. Here, the evidence was not close. The defendant confessed to Detective Grzenia that he acted as the lookout and driver for Poco during the burglaries. The evidence further showed that the defendant was found in possession of proceeds from both burglaries within hours of those burglaries, which occurred within hours of each other. The evidence showed he told Polaepalli, Holla, and Detective Grzenia he bought the phone around midnight, but Polaepalli still had the phone in her possession at 12:30

a.m. It showed the defendant coincidentally happened to not only purchase the phone on the night it was stolen but was found to have the laptops and guitar from the second burglary committed close in time and proximity to the first in his vehicle. Taken with his confession to Detective Grzenia, the evidence was not closely balanced regarding the defendant's participation in the burglaries. Accordingly, the purported error in sustaining the State's objection to one of the defendant's attacks on Detective Grzenia's credibility, and the jury's resultant inability to consider the inference that Detective Grzenia had motive to fabricate a confession, was not potentially dispositive of the case. Therefore, the first prong of plain error review does not provide a basis for excusing the defendant's procedural default. *Thompson*, 238 Ill. 2d at 614. We accordingly affirm the defendant's convictions.

¶ 34                                CONCLUSION

¶ 35    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 36    Affirmed.