2020 IL App (1st) 162688-U

SIXTH DIVISION
May 22, 2020

No. 1-16-2688

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

───────────────────────────────────────────────

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

───────────────────────────────────────────────

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9548 |
| | ) | |
| ENOCH JACKSON, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for first degree murder is affirmed where the trial court's
improper Rule 431(b) admonitions did not rise to the level of plain error because
the evidence was not closely balanced.

¶ 2    Following a jury trial, defendant Enoch Jackson was found guilty of first degree murder

and sentenced to 48 years of imprisonment. He appeals, arguing that the trial court committed

plain error by failing to properly admonish the jury as required by Illinois Supreme Court Rule

431(b) (eff. July 1, 2012). Although the State concedes that the admonishments given did not

comply with Rule 431(b), Mr. Jackson forfeited this claim by failing to object to the admonishments at trial and has not shown that the evidence was closely balanced, such that it rose to the level of first-prong plain error. For this reason, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Mr. Jackson was charged by indictment in the shooting death of Darius Hartfield on November 28, 2012. The State proceeded on two counts of first degree murder (720 ILCS 5/9-1 (West 2012)).

¶ 5     During jury selection, the trial court gave the Rule 431(b) admonishments that are at issue on this appeal. Those admonishments included the statement that "[t]he defendant is not required to prove his innocence; nor is he required to present any evidence on his own behalf." The court did not ask the venire any questions regarding this principle.

¶ 6     The court then explained that (1) criminal defendants are presumed innocent; (2) the burden of proof is beyond a reasonable doubt; (3) the State has the burden of proof; and (4) a defendant has the right to testify or not testify, and his decision not to testify cannot be held against him. The court asked whether anyone had any problems understanding these principles or any "problems" or "qualms" about applying them. No one responded. The jury was not asked if it understood or accepted any of these principles.

¶ 7     The evidence at trial established that the shooting took place near 69th Street and Ridgeland Avenue, where Mr. Hartfield was found near a red Ford Taurus with a "broken window and bullet holes" on the side. No gun was recovered but forensic examiners testified that the bullets and shell casings recovered were fired by the same weapon.

¶ 8     Detective David March testified that on December 5, 2012, he received information from the Brooklyn Park Police Department in Minnesota that prompted him to speak with Tiara Herman,

who in turn agreed to record her telephone conversations with Mr. Jackson. She recorded a total of five calls, which Detective March then reviewed. Based on the calls, Detective March contacted Cordell Armstead, who had witnessed the shooting, and showed him a photo array containing photographs of Mr. Jackson and Mr. Jackson's cousin Jabari Dancy. Mr. Armstead identified Mr. Dancy as the man he saw on November 28, 2012, at 69th and Ridgeland, around the time of the shooting. Officers arrested both Mr. Jackson and Mr. Dancy on April 10, 2013. Following the arrests, Mr. Armstead identified Mr. Dancy in a lineup. He did not identify Mr. Jackson.

¶ 9     Ms. Herman testified at trial that she and Mr. Jackson have a child together. She stopped dating Mr. Jackson and moved to Minnesota with their son in fall 2012 but continued to speak with Mr. Jackson by phone. On December 5, 2012, Mr. Jackson called Ms. Herman and told her that he had shot someone a week earlier, after the man broke into Mr. Dancy's house. He told her that the window of the vehicle in which the man was sitting shattered during the shooting.

¶ 10    After this phone call, Ms. Herman contacted the police in Minnesota and agreed to tape her future calls with Mr. Jackson. Ms. Herman testified that she listened to the recordings after they were made and confirmed their accuracy. The State published the recordings, and they are included in the record on appeal.

¶ 11    During a conversation on December 6, 2012, Ms. Herman asked if Mr. Jackson did "that for real," or whether he was "lying *** to get [her] to come back." Mr. Jackson said, "[n]o," and he "shouldn't have did it." Mr. Jackson added that he no longer had the weapon and that someone may have seen Mr. Dancy, but that person did not see Mr. Jackson's face.

¶ 12    During a subsequent conversation on December 9, 2012, Ms. Herman assured Mr. Jackson that they would get back together. And on December 13, 2012, Mr. Jackson told Ms. Herman that he had spoken with the police and they did not have any evidence. He also told her that someone

named "Jenny" or "J" had disposed of the boots, jogging pants, and hooded sweatshirt he was wearing at the time of the shooting. Mr. Jackson told Ms. Herman that he could live with what happened because it felt like he was in somebody else's body. He "never thought" he would be a "murderer." Ms. Herman asked whether Mr. Jackson had intended to kill the victim, and Mr. Jackson replied that he would be in jail if the victim had not died. He said he "f*** up" and, "I robbed, I stole, I killed." He asked whether Ms. Herman would turn him in. She assured him she would not, and that nobody else knew Mr. Jackson committed the offense. Mr. Jackson replied that "[t]hey know enough" because Mr. Dancy's house had been burglarized and the person who broke in "turned up dead" days later.

¶ 13   Ms. Herman had previously testified before a grand jury on April 4, 2013. At trial she did not recall testifying at that time that Mr. Dancy was with Mr. Jackson during the shooting, but acknowledged testifying that Mr. Jackson told her Mr. Dancy was talking to "Dez" to stall so that Mr. Jackson could "walk up," and he knew he hit "Dez" during the shooting because "Dez" died that night.

¶ 14   On cross-examination, Ms. Herman said she has known Mr. Jackson since she was 15 years old. They started dating in 2010. She did not tell Mr. Jackson about her plans prior to moving to Minnesota. Mr. Jackson was upset and wanted her to return, but Ms. Herman told him she would not and he could not join her. She and Mr. Jackson had broken up multiple times for short periods, sometimes due to domestic violence. During these times, it was not unusual for Mr. Jackson to lie to convince Ms. Herman to return. Ms. Herman acknowledged that she agreed to get back together with Mr. Jackson after he told her he had shot someone, explaining that she did not initially believe him.

¶ 15   Ms. Herman also admitted that she drank a lot of alcohol the night of December 4, 2012,

and only slept for a short time before taking Mr. Jackson's call the next morning. She still felt intoxicated during the call. She also said that while she was at the police station in Chicago on March 25, 2013, Mr. Jackson called her and said he had shot another person. Ms. Herman told the police, who found no indication that another shooting occurred. She also admitted that she and Mr. Jackson argued the day she testified before the grand jury, and she agreed that there were "things" she said that day because she was "angry with him."

¶ 16     On redirect, Ms. Herman said she "exaggerated the truth a bit" during her grand jury testimony. She agreed that she moved to Minnesota because Mr. Jackson "put hands" on her. During her initial conversation with detectives, she relayed that the victim was sitting in his vehicle speaking to Mr. Dancy when Mr. Jackson fired through the driver-side window.

¶ 17     The State recalled Detective March, who testified that Ms. Herman never mentioned Mr. Jackson admitting to another shooting while she was at the police station on March 25, 2013.

¶ 18     Defense witness Jennifer Ratliff testified that she was dating Mr. Dancy at the time of trial. She never received a hooded sweatshirt, sweatpants, boots, or a firearm from Mr. Jackson or Mr. Dancy in November 2012. On cross-examination, Ms. Ratliff said she had dated Mr. Dancy for 10 years. She confirmed that someone had broken into Mr. Dancy's house in fall 2012, but Mr. Dancy had never discussed a subsequent shooting with her.

¶ 19     Anica Jackson, Mr. Jackson's mother, testified that Mr. Jackson was "really depressed" after Ms. Herman moved to Minnesota and suffered from migraines and crying spells. He told his mother that he wanted Ms. Herman back. Mr. Jackson started making up "little statements" to "get [Ms. Herman] back," and even asked Ms. Jackson to pretend that she had a terminal illness. She was concerned that Mr. Jackson would hurt himself. On cross-examination, Ms. Jackson said she loved Mr. Jackson and would do anything for him, including lying on his behalf.

¶ 20 In closing argument, defense counsel submitted that Mr. Jackson was lying when he told Ms. Herman he shot Mr. Hartfield "because he was trying get [Ms. Herman] to come back." Counsel argued that Mr. Jackson was afraid he would not see his son again and emphasized the other times he had lied to Ms. Herman. According to counsel, Mr. Jackson lied on the recordings, including falsely claiming that he had committed another shooting and that the police had interviewed him. Counsel pointed out that no physical evidence tied Mr. Jackson to the scene.

¶ 21 During deliberations, the jury requested transcripts of the phone calls and of Ms. Herman's grand jury testimony and asked what day of the week November 28, 2012, fell on. The court responded that the phone call transcripts had not been entered into evidence, the jury could not see the transcript of Ms. Herman's grand jury testimony, and November 28, 2012, was a Wednesday.

¶ 22 The jury found Mr. Jackson guilty of first degree murder and further found that he personally discharged a firearm. The court denied Mr. Jackson's motion for judgment notwithstanding the verdict and for a new trial. After a hearing, the court merged the counts, sentenced Mr. Jackson to 48 years of imprisonment, and denied his motion to reconsider.

¶ 23 II. JURISDICTION

¶ 24 Mr. Jackson was sentenced on September 6, 2016, and he timely filed a notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Supreme Court Rules 603 and 606, governing criminal appeals (Ill. S. Ct. R. 603 (Feb. 6, 2013); Ill. S. Ct. R. 606 (eff. Dec. 11, 2014)).

¶ 25 III. ANALYSIS

¶ 26 Illinois Supreme Court Rule 431(b) mandates that the trial court ask each venireperson, individually or as a group, whether he or she understands and accepts four principles: (1) the defendant is presumed innocent, (2) the State must prove the defendant guilty beyond a reasonable

doubt, (3) the defendant need not present any evidence on his behalf, and (4) if the defendant chooses not to testify, it cannot be held against him. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see also *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 27 On appeal, Mr. Jackson argues that the trial court's Rule 431(b) admonitions were improper because the court (1) did not ask any questions regarding the principle that a defendant is not required to introduce evidence on his behalf, and (2) did not ask whether the jury "accepted" any of the four of the principles that the court is required to admonish the jury about under Rule 431(b). Mr. Jackson admits that he did not preserve these issues but contends we can review them for plain error. The State argues that the jury was properly admonished on three of the four Rule 431(b) principles but acknowledges that the court did not properly inquire as to whether the jury understood and accepted that Mr. Jackson had no obligation to present evidence and that this was a clear and obvious error. The question therefore is whether this rises to the level of plain error.

¶ 28 Under the plain error doctrine, errors that were not preserved below can be reviewed when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) "that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Coats*, 2018 IL 121926, ¶ 9. Mr. Jackson contends that the first prong applies.

¶ 29 We agree with the State, however, that there was no plain error here because the evidence was not closely balanced. Whether evidence is closely balanced requires a "qualitative, commonsense assessment" of the evidence on both the substantive elements of the charged offense and the witnesses' credibility. *People v. Sebby*, 2017 IL 119445, ¶ 53. "The issue *** does not

involve the sufficiency of close evidence but rather the closeness of sufficient evidence." *Id.* ¶ 60. The evidence may be closely balanced if each party provides a credible version of events and no evidence corroborates either account. *Id.* ¶ 63.

¶ 30    While Mr. Jackson is correct that there was no physical evidence or eyewitness testimony directly linking him to this crime, there was ample evidence and it was completely consistent with the physical evidence and eyewitness testimony. At trial, Ms. Herman testified that Mr. Jackson called her on December 5, 2012, and confessed to the shooting, saying it was in response to Mr. Hartfield breaking into Mr. Dancy's apartment. She also testified that he told her that the window of the vehicle the victim was sitting in was shattered. The State published a series of subsequent phone calls between Ms. Herman and Mr. Jackson. During a December 6, 2012, call, Mr. Jackson said a witness may have seen Mr. Dancy and denied lying about the shooting to "get [Ms. Herman] to come back." On December 13, 2012, Mr. Jackson said that "J" or "Jenny" disposed of his clothing, stated that he had "killed," asked Ms. Herman whether she would turn him in, and noted that he could be connected to the murder because the person who burglarized Mr. Dancy's house "turned up dead" days later. These repeated statements by Mr. Jackson are consistent with the forensic evidence. Most significantly, they are also consistent with the eyewitness testimony of Mr. Armstead who identified Mr. Dancy as being near the vehicle in which the victim was shot moments after the shooting.

¶ 31    There was undoubtedly evidence that the jury could have found undermined the State's case. For example, Ms. Herman acknowledged that Mr. Jackson previously lied to her because he wanted to resume their relationship. She also testified that he claimed to have done a second shooting, when there was no evidence that this occurred. Mr. Jackson's mother testified that he had a history of lying, and Ms. Ratliff denied taking Mr. Jackson's clothes, although she

acknowledged that someone broke into Mr. Dancy's apartment in fall 2012. But these facts do not render the evidence closely balanced in the face of Mr. Jackson's own incriminating statements.

¶ 32    Mr. Jackson's admissions to Ms. Herman clearly described the motivation for the shooting, his involvement in the murder, and his conduct afterwards. They were also partly corroborated by Mr. Armstead's and Ms. Ratliff's testimony, as well as the forensic evidence. While the defense presented some evidence that Mr. Jackson had lied on other occasions, there was no evidence that demonstrated that he was lying when he said he committed this murder. There is simply no basis on which to conclude the evidence at trial was "closely balanced."

¶ 33                                    IV. CONCLUSION

¶ 34    Because the evidence was not closely balanced, the trial court's Rule 431(b) error does not rise to the level of plain error. Accordingly, Mr. Jackson's procedural default of the issue will not be excused, and his conviction for first degree murder is affirmed.

¶ 35    Affirmed.