NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190580-U

NO. 4-19-0580

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 9, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Woodford County |
| ANTHONY N. CLARK, | ) | No. 19CF62 |
|     Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Charles M. Feeney III, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Cavanagh and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding defendant was not denied a fair trial because he failed to demonstrate he was prejudiced by (1) the allegedly erroneous admission of a prior consistent statement made by a key State witness or (2) the State's allegedly improper questioning on his opinion of that witness's credibility.

¶ 2    Following a jury trial, defendant, Anthony N. Clark, was convicted of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)) and sentenced to 30 months' probation. Defendant appeals, arguing he was denied a fair trial because the State (1) elicited from a testifying officer an inadmissible prior consistent statement made by a key State witness and (2) improperly cross-examined him on his assessment of that witness's credibility. Defendant acknowledges he forfeited these claims but maintains we may consider their merit under the plain-error doctrine or, alternatively, as a matter of ineffective assistance of counsel. We affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. The Charge

¶ 5        On May 2, 2019, the State charged defendant with domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2018)), a Class 4 felony due to his previous domestic battery conviction in La Salle County case No. 98-CM-1764. The State alleged that on May 1, 2019, defendant made physical contact of an insulting or provoking nature with Kristy Darm, a family or household member, in that he "punched *** Darm in the shoulder and poked [her] in the neck with his finger ***."

¶ 6                    B. Jury Trial

¶ 7        Defendant's case proceeded to a jury trial. At trial, four witnesses testified: (1) Darm, (2) Darm and defendant's nine-year-old daughter, A.C., (3) Officer Jared Clark, and (4) defendant. The State also introduced into evidence a written statement given by Darm on the morning of the alleged battery.

¶ 8                    1. *Kristy Darm*

¶ 9        Kristy Darm testified she had been dating defendant for 11 years. Darm and defendant had two children together—a nine-year-old daughter and an eight-year-old son, both of whom lived with defendant as of the time of the trial. Prior to May 1, 2019, Darm had been living with defendant and their children for approximately six months.

¶ 10        Darm testified that on the evening of April 30, 2019, defendant was arguing with her about her "cheating" on him, which was something they had argued about "[o]ff and on for a few years." The argument lasted until "probably early morning" and continued when they awoke the next day. Darm testified that during the argument, defendant would get in her face and yell at her, but the only physical contact between them consisted of her pushing defendant out of her

way. Darm further testified she called the police because defendant would not let her leave the house with their daughter. A police officer responded to the call and spoke with Darm in the driveway. Darm testified she could not remember what she told the police officer nor did she recall making a written statement. When the prosecutor showed her a copy of a written statement with her signature and asked if she wrote the statement, Darm replied, "I did, but I don't remember."

¶ 11                                    2. *A.C.*

¶ 12          A.C. testified she did not go to school on May 1, 2019, because she was sick. On that date, she heard Darm and defendant arguing about "the Jason thing[,]" which A.C. described as defendant "say[ing] that [Darm] cheated on him." According to A.C., defendant and Darm were yelling at each other and defendant would occasionally "go up in [Darm's] face" and Darm would "push him away." At one point during the argument, A.C. witnessed defendant "push[ ] [Darm] back." A.C. further testified she observed defendant "hit" Darm twice on the arm with an "open hand."

¶ 13                              3. *Officer Jared Clark*

¶ 14          Jared Clark testified he was a police officer with the Minonk Police Department when the incident in question occurred. Officer Clark was dispatched to defendant's residence in response to a "domestic altercation." Upon arrival, he observed Darm sitting in a vehicle crying. He briefly spoke to Darm and then went inside to speak with defendant. Defendant told Officer Clark "nothing had happened and to not arrest him." Due to "past encounters" with defendant in which he had locked Darm out of the house, Officer Clark placed defendant in the back of his vehicle before returning to Darm to ask her about the incident and to provide a written statement.

Darm agreed to provide a written statement, and a copy of the statement was admitted into evidence.

¶ 15      In the statement, Darm indicated that when she arrived home on April 30, 2019, defendant "started yelling at me all night." According to Darm, defendant "grabbed" her "many times," hit her on the arm and leg, and grabbed her neck. The following morning, defendant "was calm for about ten minutes then the same thing started." Defendant followed Darm into the bathroom while yelling at her and hit her on the arm again. Darm then "pushed him away" and ran outside to call the police.

¶ 16      Officer Clark testified he also spoke with A.C. The prosecutor inquired, without objection, if A.C. told him what she had witnessed, and Officer Clark answered, "She advised me in the presence of her mother as well that she observed [defendant], her father, make contact with her mother, with [Darm]."

¶ 17                              4. *Defendant*

¶ 18      Defendant testified that on April 30, 2019, Darm asked to come over and spend time with him and their children. According to defendant, he and Darm prepared a meal and "had a good time" until they began to argue. At approximately 11 p.m., Darm told defendant "the guy she cheated on she liked him better." Defendant "started crying" and ended up sleeping in his son's room. He woke up "mad" the next morning and walked into the bedroom and asked Darm, "don't you think what you told me last night was atrocious?" Defendant testified he followed her around the house and "just proceeded to keep repeating the same thing." Finally, Darm yelled at him to leave her alone, so he returned to the bedroom and "nothing else happened." While defendant was in the bedroom, Darm ran outside and got in her vehicle. Defendant went outside

to see what she was doing, and Darm held her phone to the window to indicate she was calling the police.

¶ 19        On cross-examination, defendant denied making physical contact with Darm and stated he did not remember Darm pushing him. He later testified she may have pushed him, but then finally concluded that she did not push him. The prosecutor asked defendant, without objection, "So your daughter [A.C.] who testified, you are basically stating she is a liar?" Defendant responded, "No."

¶ 20                                5. *Guilty Finding*

¶ 21        Following the presentation of evidence and closing arguments, the jury found defendant guilty.

¶ 22                                C. Sentence

¶ 23        The trial court sentenced defendant to a 30-month term of probation.

¶ 24        This appeal followed.

¶ 25                                II. ANALYSIS

¶ 26        Defendant argues he was denied a fair trial because the State (1) elicited from Officer Clark the substance of an inadmissible prior consistent statement made by A.C. and (2) improperly cross-examined him on his assessment of A.C.'s credibility. Defendant concedes he forfeited these claims but maintains we may excuse his forfeiture under the first prong of the plain-error doctrine because the alleged errors were "clear or obvious" and "the jury was presented with a straightforward credibility contest that was, by definition, closely balanced." Alternatively, relying on *People v. Moore*, 2020 IL 124538, 161 N.E.3d 125, defendant contends we may address the merits of his claims because their forfeiture was due solely to counsel's ineffectiveness. Whether a forfeited claim is reviewable as plain error and whether counsel was

constitutionally ineffective are questions of law reviewed *de novo*. See *People v. Johnson*, 238 Ill. 2d 478, 485, 939 N.E.2d 475, 480 (2010) (addressing plain error); *People v. Hale*, 2013 IL 113140, ¶ 15, 996 N.E.2d 607 (addressing ineffective assistance).

¶ 27        The plain-error doctrine allows reviewing courts to excuse a forfeited claim when, in relevant part, "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant ***." *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410 (2007). If a defendant shows the evidence was closely balanced, "prejudice is not presumed; rather, the error is actually prejudicial." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 51, 89 N.E.3d 675. To determine whether the evidence was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. This requires "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* Our supreme court has held evidence is close when a fact-finder is left to resolve a "contest of credibility[,]" which occurs when both the State and defense present credible versions of events and neither version is corroborated or contradicted by extrinsic evidence. (Internal quotation marks omitted.) *Id.* ¶ 63; see also *People v. Naylor*, 229 Ill. 2d 584, 607, 893 N.E.2d 653, 668 (2008) ("Given these opposing versions of events, and the fact that no extrinsic evidence was presented to corroborate or contradict either version, the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant.").

¶ 28        Ineffective-assistance-of-counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984) (adopting the *Strickland* standard). "To prevail on a claim of ineffective

assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 687). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 79, 106 N.E.3d 944. "[W]e may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance." *Hale*, 2013 IL 113140, ¶ 17.

¶ 29 In *People v. White*, 2011 IL 109689, ¶ 133, 956 N.E.2d 379, the supreme court highlighted the similarities between first-prong plain error and a claim of ineffective assistance of counsel:

"Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict may have resulted from the error and not the evidence properly adduced at trial [citation] (plain error); or that there was a reasonable probability of a different result had the evidence in question been

excluded (see *Strickland*, 466 U.S. at 694)." (Internal quotation marks omitted.)

Because the *White* court determined from a review of the record that the defendant could not show prejudice under either analysis, it found there was "no reason" to analyze whether error occurred: "Even if we were to assume, *arguendo*, there was error in the admission of evidence ***, the evidence against defendant is such that he cannot show prejudice for purposes of either analysis." *Id.* ¶ 144.

¶ 30    Here, even assuming, *arguendo*, defendant could demonstrate clear or obvious error occurred or that counsel's performance was deficient, or both, the evidence against him was such that he cannot show prejudice under either a plain-error or ineffective-assistance analysis.

¶ 31    Beginning with plain-error prejudice, the contested element of the charged offense was whether defendant made physical contact of an insulting or provoking nature with Darm. On the one hand, A.C. testified she observed defendant "push" Darm multiple times and "hit" her twice with an open hand on the arm. On the other hand, defendant testified, inconsistently, that Darm may or may not have pushed him, and that he did not strike Darm. Were this the only evidence presented, we might agree with defendant's characterization of this case as a credibility contest on the issue of whether he pushed or struck Darm. However, A.C.'s version was strongly corroborated by extrinsic evidence—Darm's contemporaneous written statement—and defendant's version was strongly contradicted by this evidence. Therefore, this case cannot be properly classified as a contest of credibility, as such a classification would require two credible versions of events *and "no extrinsic evidence *** to corroborate or contradict either version ***."* (Emphasis added.) *Naylor*, 229 Ill. 2d at 607.

¶ 32 Moreover, a "commonsense assessment" of the evidence reveals defendant's and Darm's testimony regarding the incident was contradictory and not credible. See *Sebby*, 2017 IL 119445, ¶ 53. For example, Darm testified to specific details about the argument and asserted the only physical contact with defendant occurred when she pushed him. However, when confronted with her contemporaneous written statement in which she described defendant "grabbing" and "hitting" her numerous times, Darm claimed she could no longer remember whether its substance was true. In addition, defendant initially testified Darm did not push him. Then he testified Darm did push him. He finally concluded Darm did not push him. In short, we find A.C.'s credible and consistent testimony was corroborated by extrinsic evidence consisting of Darm's written statement, while Darm's and defendant's inconsistent testimony lacked credibility and was contradicted by this same evidence. Accordingly, we cannot say the evidence was so close that the alleged errors threatened to tip the scales of justice against defendant. Thus, we find no plain error occurred.

¶ 33 As for defendant's contention he was prejudiced based on an ineffective-assistance analysis, we find his reliance on *Moore* misplaced. In that case, the defendant appealed from his conviction for unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2012)), arguing his counsel "was ineffective for failing to stipulate to [the] defendant's felon status, thereby allowing the jury to consider highly prejudicial evidence that [his] prior conviction was for murder." *Moore*, 2020 IL 124538, ¶ 1. The *Moore* court found the defendant was prejudiced by his counsel's deficient performance because the "case essentially involved a credibility contest between [a police officer's] version of events and the version presented by [the] defendant and his witness ***." *Id.* ¶ 48. According to the officer's version, he pulled the defendant over and the defendant "volunteered, 'I have a loaded firearm in the front

center console of my car.' " *Id.* ¶ 49. The other version consisted of the defendant and his witness testifying the defendant did not make the above statement and he had no knowledge the weapon was in the vehicle because it belonged to the witness, who accidentally left it in the vehicle the previous day. *Id.* ¶ 51. In concluding the case "present[ed] a classic case of closely balanced evidence[,]" the court noted the jury "was faced with two plausible versions of events that depended on witness credibility" and explicitly pointed to the fact "there was no extrinsic evidence to corroborate [the officer's] account of the incident regarding [the] defendant's alleged statement." *Id.* ¶¶ 50, 52.

¶ 34 Here, as previously noted, and unlike in *Moore*, there *was* extrinsic evidence that corroborated A.C.'s version of events and contradicted defendant's version. Accordingly, for the reasons discussed above, we cannot say the evidence was such that, but for counsel's allegedly unprofessional errors, there is a reasonable probability the result of the proceeding would have been different.

¶ 35                                     III. CONCLUSION

¶ 36 For the reasons stated, we affirm the trial court's judgment.

¶ 37 Affirmed.